**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

KEN LASHUAY, *Individually*
*and as Personal Representative*
*of the Estate of David Lashuay*,

        *Plaintiff*,

*v.*

RN LORRAINE VANBERGEN, *et al.*,

        *Defendants*.
_____/

CASE NO. 17-13581

DISTRICT JUDGE THOMAS L. LUDINGTON
MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 90, 92)

## I.   RECOMMENDATION

Plaintiff Ken Lashuay represents the estate of his deceased son, David Lashuay, who claimed that defendants violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs while he was incarcerated by the Michigan Department of Corrections (MDOC). (ECF No. 65, 109.)[1] For the reasons that follow, I recommend that the Court:

- **GRANT** the motion of defendants Trout, Zeigler, Borgerding, Sigler, Vanbergen, Klee, Dunning-Meyers, and DeLine (ECF No. 90); and

- **GRANT in PART and DENY in PART** the motion of defendants Papendick, Whiteman, Hill, Larson, and Rais, dismissing all claims and defendants except the

---

[1] For ease of reference, I will refer to David Lashuay as "Plaintiff" throughout this Report. He passed away in April 2019, after his release from prison. (ECF No. 88, PageID.664.) Ken Lashuay is the personal representative for his son's estates and was substituted as Plaintiff in this action on September 11, 2019. (ECF Nos. 108, 109.)

Eighth Amendment claims against Dr. Papendick and Dr. Rais for failing to arrange Plaintiff's surgery.

## II.    REPORT

### A.    Facts and Procedural History

Plaintiff was admitted to the Hurley Medical Center on July 19, 2014, after suffering burns on up to 49 percent of his body in a meth lab explosion. (ECF No. 90, PageID.1491; ECF No. 112, PageID.2917.) He remained at Hurley for three months, during which time he was placed in a medically induced coma for six weeks and received "extensive skin grafting." (ECF No. 98, PageID.2528.) Roughly three months later, on October 16, 2014, Plaintiff was transferred to the Otsego County Sheriff's Office. (ECF No. 92, PageID.2000.) The following day, he entered Duane Waters Hospital (DWH), run by the MDOC. (ECF No. 98, PageID.2527.)

While at DWH, Plaintiff interacted with various defendant nurses. Upon his arrival, Defendant Nurse Aimee DeLine[2] took the following actions: she arranged with Defendant Nurse Crystal Trout to document and assess Plaintiff's burns, although she could not measure the burns because of their extent, (ECF No. 92, PageID.2098-2099), she did photograph them (ECF No. 90, PageID.1527-1528); DeLine also set up an evaluation by former Defendant Gary Duncan, who prescribed pain medications; and she recorded that Defendant Nurse Courtney Wetzel[3] from patient services had admitted Plaintiff to a room.

---

[2] Her name appears as Delilne in some of the filings. *See, e.g.*, (ECF No. 92, PageID.1950.)

[3] Nurse Wetzel's last name is now Sigler. (ECF No. 48, PageID.423.) Because her name appears as Wetzel in the relevant medical records, and the text of her brief also uses Wetzel, I will use that name as well in the body of my Report.

(ECF No. 90, PageID.1524.) Aside from another brief mention of DeLine in another defendant's deposition—merely that DeLine had generated a document—she does not appear in any other records. (ECF No. 92, PageID.2122; ECF No. 112, PageID.2996.)

As with DeLine, the admission record marks the only report of Wetzel's actions.[4] (ECF No. 90, PageID.1524; *see also* ECF No. 90, PageID.680-681 (noting that DeLine and Wetzel are not in any further records).) A few days later, on October 19, Plaintiff asked Defendant Nurse Lorraine Vanbergen to help him clip loose skin off his chest. (ECF No. 90, PageID.1496.) She memorialized the episode in a report, also noting that he received his pain medications and he could place bacitracin on the open wounds and lotion on the scarring and dead skin. (*Id.*) This appears to be Plaintiff's only interaction with Vanbergen. *See* (ECF No. 90, PageID.681 (noting the same).)

Around this time, Plaintiff also saw Defendant Nurse Mollie Klee. On October 18, she reported that Plaintiff requested assistance: "I can manage to put the cream and bacitracin on my front," he is reported to have said, "I just need you to put it on my back and legs." (ECF No. 90, PageID.1504.) Klee helped apply the medications and recorded Plaintiff's complaints of "pain 'all over.'" (*Id.*) At the time, he needed assistance with daily activities. (*Id.*) She again saw Plaintiff on January 10, 2015, taking his vitals. (ECF No. 90, PageID.1192.) Finally, on April 23, 2015, she obtained samples for laboratory testing ordered by Defendant Nurse Tana L. Hill. (ECF No. 90, PageID.921-922.) These appear

---

[4] Plaintiff was asked at his deposition if he knew the names of these nurses, to which he responded that he could not recall DeLine, but he recognized Wetzel's name. (ECF No. 112, PageID.1421-1422.) Plaintiff's father testified that he recalled his son mentioning the name "DeLine" in correspondence but "I don't remember anything except the name. It would have been in reference to lack of care. That's all it would have been." (ECF No. 115, PageID.3746-3747.)

to be the only mentions of Klee in the medical records. She was brought up twice during the depositions: once when Plaintiff stated he could not recall her, (ECF No. 90, PageID.1877), and once when Plaintiff's father said the name Klee was familiar to him because Plaintiff "possibly" mentioned it. (ECF No. 115, PageID.3745-3746; *see also* ECF No. 90, PageID.682 (mentioning that Klee appears in no other records).)

Plaintiff also saw Defendant Nurse Timothy Zeigler. On February 18, 2015, Plaintiff reported to Zeigler that he was doing "okay today." (ECF No. 90, PageID.1095.) Zeigler's report noted that Plaintiff had open areas "related to post skin graft burn wounds" and that Plaintiff "[a]pplies own bacitracin [sic] open areas and Eucerin to healed areas daily. Independent for adls [*i.e.*, activities of daily living] and feeds self." (*Id.*) The following month, on March 18, Plaintiff mentioned a small sore under his left arm, but otherwise Zeigler's report was largely unchanged. (ECF No. 90, PageID.1002.) No other interactions between Plaintiff and Zeigler are mentioned in the records, nor is Zeigler discussed at any length in the depositions. *See* (ECF No. 112, PageID.1423 (Plaintiff's testimony that he had no recollection of Zeigler); ECF No. 115, PageID.3745 (Plaintiff's father's testimony that his son never mentioned Zeigler).)

Plaintiff had more encounters with Defendant Nurse Kimberly Dunning-Meyers, stretching from February 2015 through June 2015. On nine separate dates, Dunning-Meyers visited Plaintiff, taking his vitals, noting that Plaintiff applied the medications to his wounds, recording his pain levels, administering IVs and diagnostic testing ordered by others, and reporting on various occasions that his dressing did not confine his drainage, that he received physical therapy three times a week, that he could leave the room "during

4

out time," that he was independent in his activities of daily living, that his pain control was adequate (in May 2015), that he could "provide self care to burns on torso and arms," and that his gait was steady. (ECF No. 90, PageID.828, 863, 898, 926, 957, 983, 1019, 1062, 1077.) As for mentions in depositions, Trout noted that Dunning-Meyers had created a particular document and that she had made an entry in the wound-care monitor. (ECF No. 90, PageID.1772, 1775; ECF No. 92, PageID.2105, 2106.) Plaintiff testified that he could not recall Dunning-Meyers. (ECF No. 90, PageID.1876-1877.)

Regarding Nurse Trout, she photographed Plaintiff's burns when he entered DWH in October 2014 and again on July 2015, near the end of his time there. (ECF No. 90, PageID.746, 1527-1528.) Her name is also listed as having "[r]ead" a tuberculin skin test result, although she explained in her deposition that that record generating software was misleading and she never actually read the test, which was completed in 2013; she is also shown as having assessed his vitals. (ECF No. 90, PageID.735, 755, 756, 1753-1754.) Aside from these episodes, she does not appear to have provided any direct care; instead, her role was to review the care Plaintiff received from other nurses, reviewing the wound-care charts they developed. (ECF No. 90, PageID.1735-1736.) At her deposition, she testified that the requirements for wound-care charts were complied with in Plaintiff's case. (ECF No. 90, PageID.1736.) She also stated that her only role was taking photographs, and she had no consultations with providers regarding Plaintiff's treatment plan, nor did she ever see such a plan. (ECF No. 90, PageID.1746, 1759.) Later during the deposition, explained that her charting of Plaintiff's vitals occurred when she filled in for a nurse who had to leave suddenly. (ECF No. 90, PageID.1751-1752.) Trout also recalled being

informed by Nurse Hill that Plaintiff had an area that was not healing, so she contacted another nurse with more experience to consult. (ECF No. 90, PageID.1759.) She thought that, other than a single spot by the neck that was slow to heal, "[e]verything else was healing." (ECF No. 90, PageID.1760.)

Nurse Hill was Plaintiff's "primary provider" at DHW, a role she characterized as focusing on "infection control, wound care, and pain management." (ECF No. 112, PageID.3000.) She explained that a patient's treatment plan would be revised as needed during visits with the patient, and changes to it were marked in session notes in the "assessment plan areas." (ECF No. 112, PageID.3002.) Changes could be made by "[w]hoever is seeing the patient that day . . . . So we revise the plan every time we see the patient." (ECF No. 112, PageID.3003.) There was no longer-term plan. (*Id.*) Similarly, in his deposition, Defendant Dr. Muhammad Rais testified that any physician could come to a pain management plan once they made a diagnosis and assessed the pain. (ECF No. 92, PageID.2197.) During Hill's deposition, she testified that she had treated patients with superficial burns, but never anyone with burns as extensive as Plaintiff's and that while she had no special training for burn wounds, she did use a leading reference resource as a guide. (ECF No. 112, PageID.2974, 3000.)

Hill testified at length about Plaintiff's wound-care regimen. Regarding Plaintiff's bandaging, Hill noted that he did not initially want bandages, which caused pain on the open wounds; according to Hill, he never complained to her about any lack of bandaging and she tried multiple other methods (such as meshing) to cover his wounds. (ECF No. 112, PageID.3007, 3009-3011.) She also ordered fresh linens daily. (ECF No. 112,

PageID.3009.) When they discovered that his mirror for seeing where to apply ointment was missing, they got him another one. (ECF No. 112, PageID.3007-3008.) While the wounds would open in new places, overall the openings and discharges decreased over time. (ECF No. 112, PageID.3013-3014.) Also, during his time at DWH, the nurses completed a patient care flowsheet to record two check-ups each day measuring things like ambulation, pain levels, social activity, and functional level. (ECF No. 90, PageID.1569-1620.)

Regarding medications, when Plaintiff arrived from Hurley, he took, among other things, methadone (3 tablets every 8 hours), morphine (2 tablets every 3 hours), and gabapentin (Neurontin) (2 tablets every 8 hours). (ECF No. 112, PageID.2920.) DWH kept him on that regimen initially, and he was given other medications such as bacitracin. (ECF No. 112, PageID.2923.) In October, Danielle Alford, PA, switched his methadone for one 60mg tablet of MS Contin. (ECF No. 112, PageID.2925.) Hill testified that DWH does not regularly prescribe methadone and therefore she tried early on to switch to an equivalent dose of morphine. (ECF No. 112, PageID.3004-3005.) She noted that there were risks with every narcotic like methadone, but she could not think of anything specific. (*Id.*) A doctor at the facility, Defendant Dr. Terrence Whiteman, testified that methadone was "not a good drug for analgesia," so the hospital used a superior drug; specifically, methadone's residual effects outlasted its period of effectiveness, remaining in the bloodstream well after it wore off and leading to potential repercussions such as respiratory depression. (ECF No. 92, PageID.2225-2226.) He also observed that Plaintiff was a substance abuser. (ECF No. 92, PageID.2226.) Defendant Dr. William Borgerding, who had been the chief medical officer

7

or assistant chief medical officer during the relevant period, testified that "long-term narcotics are really not recommended for anything," they were "highly addictive," and "there's really not a lot of studies that show their benefit," so "the idea is to get them off sooner than later." (ECF No. 112, PageID.2909.)

Later in October, Nurse Jennifer Weirman added one 15mg tab of MS Contin every 8 hours so that Plaintiff would now be receiving 75mg total. (ECF No. 112, PageID.2927.) She also took his dosage of gabapentin from 100mg (which was giving him "200mg PO Q8hrs") to 400mg (which gave him "2 tabs PO Q8hrs"). (*Id.*) In November, Hill upped the gabapentin (Neurontin) to 3 tabs of 400mg every 8 hours, giving him 3600mg each day. (ECF No. 112, PageID.2929.) Later that month, Hill reordered the medications (including morphine at 30mg every 4 hours). (ECF No. 112, PageID.2931.) These dosages stayed the same the following month, and Hill added amitriptyline (25mg at bedtime) for pain. (ECF No. 112, PageID.2932; ECF No. 98, PageID.2603.)

In January 2015, Hill renewed his medications in the same dosages, including MS Contin, bacitracin, and morphine, among others. (ECF No. 98, PageID.2592.) At her deposition, Hill was asked why she discontinued applying Aquacel AG to weeping wounds on January 19, 2015, and why her notes on that day stated Plaintiff had to remove scabbing and apply bacitracin ointment to open areas. (ECF No. 112, PageID.3149-3150; ECF No. 90, PageID.1169.) Hill said the Aquacel wasn't working and that Hurley (which Plaintiff had recently seen for a follow-up, discussed below) wanted the scabs removed. (ECF No.

112, PageID.3049-3050.)[5] On the same day, Hill added amitriptyline for neuropathic pain. (ECF No. 90, PageID.1169; ECF No. 92, PageID.2199.)

Around the same time, she submitted a request that Defendant Dr. Keith Papendick approved for continued physical therapy. (ECF No. 98, PageID.2593-2594.) Hill had also been prescribing the maximum dosage of Neurontin (gabapentin). (ECF No. 98, PageID.2603.) The medication order for February kept his medications steady but increased the Amitriptyline to 50mg at bedtime. (ECF No. 112, PageID.2934.)

Hill ordered same roster of medications and dosages again in March. (ECF No. 112, PageID.2935.) The same month, Plaintiff was "in good spirits," with "[n]o new complaints" and normal vital signs due to the "addition of new medication." (ECF No. 98, PageID.2612.) According to the notes, Plaintiff's pain had "been stable for months." (ECF No. 98, PageID.2613.) Hill kept the medications the same in April and submitted another request for continued physical therapy, which was approved. (ECF No. 112, PageID.2936; ECF No. 98, PageID.2617-2618.)

In May, Hill continued Plaintiff's current medications and dosages. (ECF No. 112, PageID.2937) He was doing well that month, according to Hill's report, and the pain control was "[a]dequate." (ECF No. 98, PageID.2623-2624.) The following month she took Plaintiff off of MS Contin and reduced his morphine from a 30 mg tablet every four hours to one every six hours. (ECF No. 98, PageID.2630.) In June, too, she submitted requests

---

[5] Although she could not recall at the deposition a specific request by Hurley to discontinue the Aquacel, her progress notes from February 23, 2015 stated that Plaintiff "[r]elates that he has been instructed to remove all scab areas and apply bacitracin until these wounds are healed per Hurley Burn Center." (ECF No. 98, PageID.2602.)

(that were ultimately approved by Dr. Papendick) for refitting of his Jobskin burn stockings and for continued physical therapy. (ECF No. 98, PageID.2635-2638.)

More generally, at her deposition Hill could not recall that Plaintiff frequently requested additional pain medication, and she explained that she added several on her own, including Neurontin and morphine. (ECF No. 112, PageID.3062.) The hospital's goal was to get patients functioning again, so she measured Plaintiff's pain in part based on whether he could independently complete daily activities. (ECF No. 112, PageID.3063.) This, along with vital signs and other indications, provided objective signs by which to judge subjective complaints of pain. (ECF No. 112, PageID.3063-3064.) Dr. Whiteman similarly testified that the effectiveness of pain medications was gauged by objective observations, such as the appearance of discomfort and the patients' functional capacities. (ECF No. 92, PageID.2227-2228.)

In addition to these treatments, additional procedures on Plaintiff's burns were being considered. Plaintiff had a checkup at Hurley in December 2014. (ECF No. 98, PageID.2586-2587.) Hill testified that she sent the request to have him examined at Hurley. (ECF No. 112, PageID.3016.) At the time, he had been improving and she likely called Hurley to see if they wanted him back for a follow up. (ECF No. 112, PageID.3019-3020.) At Hurley, Dr. Stephen Morris noted that Plaintiff had "some scattered residual unhealed areas," no signs of infection, left-elbow and anterior neck contractures, some difficulty extending his neck, and webbing between two fingers on his right hand, and that the grafting in his neck had healed well. (ECF No. 98, PageID.2586.) Plaintiff testified that Dr. Morris reacted to seeing him by "throwing his hands in the air and said I don't know

what we did anything for because my condition was so poor that he was disgusted that he put all his effort into fixing me . . . ." (ECF No. 112, PageID.3213)

After examining Plaintiff, Dr. Morris wrote out his recommendations to DWH medical officials:

> [R]ecommending redo skin grafts on the left side of the neck, the left shoulder, the scattered areas in the right shoulder, and the anterior chest. It is also recommended that he undergo daily hand therapy and physical therapy. At some point in the future months, he will benefit from a contracture release and regrafting. Quite likely it would be useful to use Integra on these. However, this should wait until all of the small residual open areas are healed.

(ECF No. 98, PageID.2586; *see also* ECF No. 113, PageID.3571 (handwritten note from Dr. Morris containing these recommendations).) A skin graft "adds an element to grant the skin together," whereas the contracture "cuts the bonds of the skin." (ECF No. 112, PageID.3132.) Dr. Morris also noted that the message to prison officials informed them that it was

> up to the prison system to determine where he gets care and we would not undertake this at Hurley unless we had written authorization for surgery and approval for however, long [*sic*] a stay was necessary which in his situation could be as long as 30 days. Particularly in contracture releases, if Integra is used it would be pointless for him to go back to the prison system or it would simply fail. However systemically he is not particularly ill.

(ECF No. 98, PageID.2586.) At Plaintiff's deposition, he said that Dr. Morris's recommendation was for immediate surgery. (ECF No. 112, PageID.3213.)

Hill said she didn't see the documentation from his visit until sometime in January 2015. (ECF No. 112, PageID.3028, 3033-3034.) Her notes from that month stated that she finally received the paperwork and that it said Hurley would do the skin grafts if he could

11

stay there until he healed. (ECF No. 90, PageID.1170.) Hill interpreted the notes from Hurley as indicating that all procedures—regrafting and contracture release—should wait until his open areas healed. (ECF No. 112, PageID.3037-3038.)

On June 5, 2015, Hill placed a "407"—DWH's term for many types of medical requests, (ECF No. 112, PageID.2990)—for the contracture release and regrafting mentioned in the Hurley notes. (ECF No. 90, PageID.815; ECF No. 98, PageID.2631; ECF No. 112, PageID.3043-3044.) On the same record reporting the 407 request, Hill wrote that "[p]ain medications will begin to be weaned now as [Plaintiff] is functioning well at this time. He regularly goes out for out time and ambulates," was able independently to do all activities of daily living, and participated in physical therapy. (ECF No. 90, PageID.815.)

A few days later, on June 9, 2015, Dr. Papendick responded to Hill's request. (ECF No. 98, PageID.2633.) During the relevant period, Dr. Papendick served as the utilization medical director, which meant he reviewed the 407 requests submitted by medical providers and formulated alternative treatment plans if necessary; he did not see patients and never saw Plaintiff, nor did he have responsibility for pain management. (ECF No. 92, PageID.2149-2152, 2159, 2980.) In determining whether to approve a 407 request, cost was never a factor, Dr. Papendick testified. (ECF No. 92, PageID.2152, 2157-2159.)

Regarding Hill's request for the procedures, Dr. Papendick stated that "[m]edical necessity not determined." (ECF No. 98, PageID.2634.) Instead, he proposed an alternative plan "to find a surgeon locally who could manage his case." (ECF No. 92, PageID.2152.) Therefore, he rejected the request and instead directed that another surgeon be found. (ECF No. 98, PageID.2634.) The problem with sending him to Hurley, Dr. Papendick testified,

12

was the 30 days he might need to remain there, raising concerns about public security. (ECF No. 92, PageID.2152, 2156.) Ultimately, Dr. Papendick testified, security concerns did not dictate the plan if the patient needed care, but the preference was for treatment at one of the two secure units in Michigan, Allegiance and McLaren, or at a local option where Plaintiff could be returned to DWH for recovery post-surgery. (ECF No. 92, PageID.2152-2153.)[6] However, if Plaintiff could not get medically necessary treatment at these alternative locations, Dr. Papendick would have approved a request to send him to Hurley—but no such request was ever made, he testified. (ECF No. 92, PageID.2157-2158.)

While the alternative plan was being formed, Plaintiff was transferred from DWH to the "C-Unit" on July 7, 2015, which was a "step down" facility, meaning "they were stable for [DWH] . . . . [and] they have a [medication] taper and then we continue that taper." (ECF No. 98, PageID.2645; ECF No. 92, PageID.2199-2200; *see also* ECF No. 92, PageID.2233 (Dr. Whiteman's testimony that the C-Unit "[p]rovides care for low security risk patients that [*sic*] can't be cared for in the general population and don't require infirmary level care").) Defendant Dr. Lynn Larson signed off on the move. (ECF No. 98, PageID.2649.) She testified that she saw Plaintiff twice, once on June 25, 2015 and once on July 7, 2015. (ECF No. 112, PageID.3091.)[7] On the first occasion, she noted webbing, restricted motion, a clawed right hand, and that his urine stream was weakened and

---

[6] He testified that he had experience with burn victims, but not extensively and he had not officially treated anyone with severe burns. (ECF No. 92, PageID.2147.)

[7] Dr. Larson testified that she was "not a burn expert" and had not "read the recent literature on burns." (ECF No. 112, PageID.3137.)

"hesitancy—on Flomax." (ECF No. 90, PageID.757.) Dr. Larson believed that despite the restricted movements and clawed hand, his function was not limited because he could still complete daily activities such as dressing himself, bathing himself, and moving independently. (ECF No. 112, PageID.3162-3163.)

According to Dr. Larson, Plaintiff's urinary problems might have been due to his amitriptyline medication (an antidepressant sometimes used for pain relief), which she reduced and later stopped upon his transfer, explaining that this medication can affect the urinary system. (ECF No. 90, PageID.758; ECF No. 112, PageID.3074, 3153-3154.) Benadryl was another possible cause of the urinary issues, so she stopped that medication as well, explaining that even though Plaintiff was taking medication specifically for the urinary problems (Flomax) he was still struggling with this issue and "the best thing to do in this situation is to remove the offending components to it, and then solve the problem." (ECF No. 112, PageID.3158.) Asked if she was concerned that discontinuing these medications might increase his pain, she responded that "when I stop medications, I review it with the patient as well" and monitor the pain level; here, for example, she decreased the amitriptyline but "the pain didn't dramatically increase . . . . So it was a trial. I didn't just stop it cold turkey." (ECF No. 112, PageID.3158-3159.)[8]

At the June visit, she continued the MS Contin prescription writing "taper as able," and morphine for breakthrough pain, and increased Neurontin due to nerve pain. (ECF No.

---

[8] Dr. Larson also testified that she stopped magnesium, which another provider had ordered for Plaintiff's constipation, because she did not use that substance to treat constipation and because he was already taking Lactulose for constipation. (ECF No. 112, PageID.3160-3161.) The records show that Hill prescribed the magnesium and Lactulose for constipation. (ECF No. 90, PageID.1169.)

90, PageID.758; ECF No. 112, PageID.3074, 3143, 3145-3146.)[9] She made more changes at the July appointment. (ECF No. 112, PageID.3076.) Gabapentin (Neurontin) was reduced from three 400mg tablets every 8 hours to two tablets; MS Contin was reduced from one 60mg tablet every 8 hours to one 60mg tablet every 12 hours; morphine went from one 30mg tab every 6 hours to one 15mg tab every 8 hours; and lidocaine and amitriptyline were discontinued. (ECF No. 112, PageID.3076.)

Tapering off narcotics was "optimal," Dr. Larson testified, and the hospital would "give enough narcotics so that the patient can care for themselves and be functional." (ECF No. 112, PageID.3143-3145.) To taper, they would reduce the narcotic "and see how he does functionally." (ECF No. 112, PageID.3145.) Plaintiff's "pain was managed quite well" both times Dr. Larson examined him. (ECF No. 112, PageID.3144.) Dr. Larson also recalled at her deposition that when she saw him, Plaintiff could care for himself and just needed help applying the bacitracin to his back. (ECF No. 112, PageID.3136.)

In the C-Unit transfer paperwork, Dr. Larson indicated that Plaintiff's elbows were "flexing," but that physical therapy was helping; his neck was webbed and had restricted range of motion; and his right hand was clawed, such that he could not fully open it. (ECF No. 98, PageID.2649.) The record also reports that DWH had provided Plaintiff, per Hurley's recommendations, with burn gloves and a second skin vest, and that Plaintiff's pain was stable with his current medications and he was "independent in self-care," so he

---

[9] She testified that she reduced the morphine prescription from every 8 hours, which was "a lot," to every 12 hours. (ECF No. 112, PageID.3143, 3145-3146.) However, the order form from June 25, 2015, shows that she ordered a 30mg tab every 6 hours. (ECF No. 112, PageID.3074.) In addition, the same form orders only 60mg of MS Contin, an apparent reduction from the 75mg he'd been taking before, although no such changes were expressly mentioned on the order form (even though adjustments were usually noted). (*Id.*)

was "ready to go to C Unit." (ECF No. 98, PageID.2655.) Additionally, his open wounds had closed. (ECF No. 98, PageID.2656.) Regarding the surgery, Dr. Larson wrote that "the cost of staying inpatient [at Hurley after the possible surgery] would be a large amount," and so they considered other options, including a Dr. Lanigan. (ECF No. 98, PageID.2655; ECF No. 112, PageID.3113.) The surgery "was still in question as of discharge." (*Id.*) At her deposition, when asked if the 30 days was "a problem for some reason that you're aware of," she responded that she "wasn't the primary provider, and I didn't get those specific answers from utilization." (ECF No. 112, PageID.3118-3119.) She followed up, however, by stating that DWH tried to employ secure units, and his physical examination showed no infection and healing wounds. (ECF No. 112, PageID.3119-3120.) Dr. Whiteman testified that the 30 days was a problem because it was "not best practices," in that he could get adequate recovery care at DWH and Hurley had no reason to believe otherwise. (ECF No. 92, PageID.2230.) Cost, according to Dr. Whiteman, wasn't a factor. (*Id.*) Hill testified that "any inmate who is off-site has to have two officers with them at all times." (ECF No. 112, PageID.3041.)

In the C Unit, Defendant Dr. Muhammad Rais took charge of Plaintiff's care. (ECF No. 98, PageID.2660.) When Plaintiff arrived in the C Unit, Dr. Rais also ordered lidocaine gel for pain relief, which Dr. Larson had discontinued upon transfer, likely because she believed Plaintiff was no longer using it and because she "knew if he needed it, it could be

reordered once he got to C Unit. So it's not like things were just going to stop."[10] (ECF No. 92, PageID.2206; ECF No. 98, PageID.2666; ECF No. 112, PageID.3156-3157, 3159-3160.) The lidocaine request was not approved, however. (ECF No. 92, PageID.2206.) Dr. Rais testified that physical therapy was one component of the pain management plan, as were non-opioid medications such as Motrin, Tylenol, and Neurontin. (ECF No. 92, PageID.2198, 2206.)

Dr. Rais noted that Plaintiff's Neurontin had been tapered, and he wrote that Plaintiff "will need Neurontin 300 mg PO Four times a day for one year." (*Id.*) He explained that tapering was measured by toleration of pain, not by its total elimination; a tapering plan "means keeping them comfortable, discontinuing it [*i.e.*, a medication] to the level where they can function." (ECF No. 92, PageID.2198.) The reason for the Neurontin taper was that "there has to be a blending Neurontin level which we check for patients inside . . . and then if the level [from lab results] is therapeutic [*sic*] range, there's no benefit for giving hydros." (ECF No. 92, PageID.2200-2201.) Dr. Borgerding testified that the need taper Neurontin depended on the type of pain a patient had, and that the drug "is not clinically indicated for pain, but it's used quite a bit." (ECF No. 112, PageID.2911.)

Tapering was "standard procedure," according to Dr. Rais, so that patients would not become dependent on an opioid, "but their pain is controlled in a compassionate way" and assessed with "constant evaluation." (ECF No. 92, PageID.2198-2199.) There was

---

[10] Dr. Larson acknowledged that she had not worked in C Unit, but she knew that "[a]ny facility that I transfer a patient to, everything gets re-evaluated." (ECF No. 112, PageID.3160.) Hill had prescribed the lidocaine before the transfer. (ECF No. 112, PageID.2943.)

17

nothing written out that labelled the progressive steps in a tapering plan. (ECF No. 92, PageID.2199.) In the C Unit, approval from the pain management committee was required to initiate opioid medications (due to their potential side effects and risk of creating dependency) or initiate a tapering plan. (ECF No. 92, PageID.2199-2200.)

When Plaintiff completed his initial taper, around August 11, 2015, he continued to request pain medications and Dr. Rais testified that he "tried to help him and give him another option to complete another taper if he want[ed] to," even though Plaintiff was not showing signs of withdrawal. (ECF No. 92, PageID.2201-2202.) Hospital records from around that time show that Plaintiff was on a Neurontin taper and that Dr. Rais concluded he "will need to continue Neurontin." (ECF No. 98, PageID.2692.) As Dr. Rais observed at the deposition, Plaintiff during this period was filing requests (called "kites") for pain medications due to ongoing pain, as well as grievances. (ECF No. 92, PageID.2202; *see, e.g.*, ECF No. 98, PageID.2693.) In a 407 request to the pain committee dated August 27, 2015, Dr. Rais observed that the Neurontin was not helping with the pain and that Plaintiff would benefit from Norco (he testified that it might have helped "just to some extent"); the request was denied a few days later by Dr. Gary Kerstein. (ECF No. 98, PageID.2709, 2711; ECF No. 98, PageID.2205.) Afterwards, Plaintiff continued to request increased pain medications and surgery. (ECF No. 98, PageID.2712-2714.) Overall, Dr. Rais testified, he requested a few tapers. (ECF No. 92, PageID.2204.)

Regarding other medications, in July 2015, Dr. Rais ordered 300mg of gabapentin (Neurontin) four times a day. (ECF No. 112, PageID.3258.) At the start of August Dr. Rais wrote, "Monitoring for pain. No change in medicine." (ECF No. 112, PageID.3307.) Later

18

that month, he continued the gabapentin (Neurontin), stopped MS Contin and morphine, and started acetaminophen (two 325mg tabs three times a day) and Mobic (one 15mg tab a day). (ECF No. 112, PageID.3260, 3262.)

When Dr. Rais visited Plaintiff on September 17, 2015, he explained the recent the pain committee's deferral of another round of tapering; he also wrote that "[i]t has been two weeks so restarting morphine and taper again will not help." (ECF No. 98, PageID.2720.) Plaintiff's kites were also addressed, (*id.*), although he continued to submit new ones complaining of pain. (ECF No. 98, PageID.2730, 2733-2734.)

Dr. Rais also followed up on the possible surgery. He understood that there was a "safety security issue" at one facility, so he sought places in Lansing and with the secured units. (ECF No. 92, PageID.2207.) On July 9, 2015, Dr. Rais requested that Plaintiff have the contracture release and regrafting procedures with Dr. Pfeiffer at Allegiance. (ECF No. 98, PageID.2663; ECF No. 92, PageID.2207-2208.) But Dr. Pfieffer wanted to see Plaintiff first—although Dr. Rais acknowledged uncertainty about whether Dr. Pfieffer made this request—so later in July Dr. Rais submitted a request for a consultation regarding the surgery. (ECF No. 98, PageID.2673; ECF No. 92, PageID.2207-2208.) The request was approved. (ECF No. 92, PageID.2207.) After reviewing Plaintiff's charts, Dr. Pfeiffer refused to see him. (ECF No. 92, PageID.2208-2209.) Following this, Dr. Rais testified that he contacted two other surgeons, Dr. Jones and Dr. Smith. (ECF No. 92, PageID.2209.) On the August 27, 2015 notes, Dr. Rais wrote that he "[t]ried to contact surgery at Allegiance and Mclaren and plastic surgery and no one is willing to accept patient for contracture release." (ECF No. 98, PageID.2708.) At his deposition, Dr. Rais explained

that "this was a complicated procedure, and there are not many plastic . . . surgeons who do this and choice is limited." (ECF No. 92, PageID.2210.)

By November 12, 2015, Dr. Rais had concluded that "[n]o Surgery or plactic [*sic*] surgery center is willing to address this and perform a surgery. Continue to montor [*sic*]." (ECF No. 98, PageID.2732; ECF No. 92, PageID.2210-2211.) Dr. Whiteman testified that many plastic surgeons might be reluctant to get involved in situations like this, where the burns resulted from a meth lab explosion. (ECF No. 92, PageID.2228.) Dr. Rais did not recontact Hurly regarding their ability to do the surgery because it was clear he could not be returned to DWH after surgery at Hurley. (ECF No. 92, PageID.2212.) He thought the conclusion had been reached that returning to Hurley for surgery was "out of the question," although he could not recall any specific discussion on the matter. (ECF No. 92, PageID.2212-2213.) It was something that others had discussed before Plaintiff came to him. (ECF No. 92, PageID.2213.)

In February 2016, Plaintiff was discharged from the C-Unit. (ECF No. 98, PageID.2749.) He was released from prison on September 1, 2016, and the same day he returned to Dr. Morris at Hurley. (ECF No. 113, PageID.3660.) He had not been back since December 2014. (*Id.*) Dr. Morris wrote:

> At this time, his burns wounds have healed. He has actually done very well. The current issues that he has involved contractures of the hands, the anterior neck and the axilla. On the right hand, there are contractures of the first webspace as well as webbing of the 2nd and 3rd web spaces. The 4th is actually quite good. On the left hand, his primary issue is a band on the radial side of the thumb. The rest of the hand does not bother him. There are some limiting contractures of the anterior neck and bilateral axilla. . . . Mr. Lashuay's advised this would require surgical release. Since the right hand bothers him the most, it will be reasonable to start with the right hand, we

could not do all of the areas at once. Quite likely, we would use an Integra regimen on the neck and axilla.

(ECF No. 113, PageID.3660.) Later that month he underwent contracture release and skin grafting on his right hand. (ECF No. 113, PageID.3661; ECF No. 114, PageID.2491-2492.) A few days after that, Plaintiff informed Hurley that he would not be following up with them because of the "excessive driving distance," and he would instead rely on his primary care physician. (ECF No. 113, PageID.3662.)

In 2018, Dr. Morris completed an affidavit. (ECF No. 90, PageID.1941-1943.) At the December 2014 appointment, Dr. Morris "recommended that [Plaintiff's] future treatment should include, at some point, a contracture release and re-grafting." (ECF No. 90, PageID.1942.) When Plaintiff returned to him in 2016, "[i]t was not too late for [Plaintiff] to have the contracture release and re-grafting procedures." (*Id.*) Plaintiff's progress at the time of the 2016 surgery "was consistent with my expectations for him." (*Id.*) Afterwards, when Plaintiff ceased following up at Hurley, Dr. Morris believed that "[h]e had the potential at that time for additional progress and improvements," possibly with additional surgeries. (*Id.*) Dr. Morris concluded that "[a]t the time of my involvement in [Plaintiff's] care from 2014-2016, I did not identify any harm that [Plaintiff] suffered as a result of inadequate or delayed medical care while incarcerated." (ECF No. 90, PageID.1943.)

The record also contains a report and affidavit from Plaintiff's physician from early 2017. (ECF No. 113, PageID.3667-3687.) To his doctor, Dr. David Yonick, Plaintiff denied tingling, numbness, or weakness, but did report stiffness and contractures in his

hands and neck. (ECF No. 113, PageID.3670.) Dr. Yonick recommended "aggressive OT and physical therapy" and "bilateral axillary Z-plasty releases." (ECF No. 113, PageID.3671.) Plaintiff reported to the physical therapist that his exercises were markedly reducing the pain. (ECF No. 113, PageID.3680.) Dr. Yonick later completed an affidavit, averring that when he evaluated Plaintiff "there was still an opportunity for a major contracture release undertaking, but only if [Plaintiff] was compliant with my recommended orders of physical and occupational therapy." (ECF No. 92, PageID.2017.) Plaintiff was not compliant and failed to schedule any follow up visits with Dr. Yonick, the affidavit concluded. (*Id.*)

One group of defendants have also presented an expert report from registered nurse Kathryn Wild. (ECF No. 90, PageID.1912-1933.) She concluded that Defendants DeLine, Trout, Wetzel, Klee, Zeigler, Vanbergen, and Dunning-Meyers followed "reasonable and acceptable practices" in their care for Plaintiff and "were not negligent nor did they consciously disregard any serious health care need." (ECF No. 90, PageID.1928.) The nurses saw him multiple times each day, providing daily fresh linens and pain medication as needed and taking his vitals, doing assessments, and managing his pain. (ECF No. 90, PageID.1928-1929.) Wild observed that the notes demonstrated that the nurses consistently "assisted [Plaintiff] with application of ointment to his burn areas that he could not reach." (ECF No. 90, PageID.1929.)

Other affidavits and reports from medical professionals also appear in the record. Dr. Matthew Hettle completed an affidavit, explaining that he treated Plaintiff at the rehabilitation unit in Hurley before the transfer to DWH. (ECF No. 92, PageID.2009.)

Upon discharge from Dr. Hettle's care, Plaintiff "presented to be independent with mobility using adaptive techniques, and he could complete all activities of daily living." (ECF No. 92, PageID.2010.) Dr. Hettle had expected that Plaintiff "would need contracture release surgery at some point in the future" and that his hands were unlikely to regain their former functionality. (*Id.*)

Dr. Randall Stolz also provided an expert report dated March 12, 2019. (ECF No. 92, PageID.2020-2030.) He explained that Plaintiff's initial roster of pain medications was "highly potent" and "were adjusted over time as seemed warranted. . . . It is standard of care to try and wean patients off of narcotics due to tolerance and to avoid addiction if possible and substitute less potent pain control medications. This was done during [Plaintiff's] care." (ECF No. 92, PageID.2029.) Ultimately, Dr. Stolz concluded that "[t]here was no delay in the wound care or pain management" and that "[t]here was no harm in waiting for further surgery until September 2016." (ECF No. 92, PageID.2030.)

Dr. Gary Vercruysse completed an expert report in March 2019. (ECF No. 92, PageID.2040-2043.) He stated that it was common for major burn victims to need "reconstructive surgery for contractures several months after they are initially grafted." (ECF No. 92, PageID.2042-2043.) Burns and sores could persist for months major burns followed by skin grafting because the initial surgery is meant to save the patient's life, so the skin used for grafting often is "relatively poor quality" and the doctors might anticipate future regrafting with better skin when the emergency passes. (ECF No. 92, PageID.2043.) In conclusion, Dr. Vercruysse wrote that although incarceration delayed the second surgery, and the "standard" of care at the DWH might not have been equivalent to that "of

a burn center," Plaintiff was not denied care "and it would likely still have taken many months/ more than a year for him to undergo revisionary burn surgery" had he not been imprisoned. (*Id.*)

Plaintiff sued various medical staff in November 2017, after his release from prison. (ECF No. 1.) In his second amended complaint, he alleges that defendants violated his rights under the Eighth and Fourteenth Amendments by being deliberately indifferent to his serious medical needs. (ECF No. 65, PageID.539-540.) His complaint listed, among other things, defendants' failure to provide the regrafting and contracture release procedures, failure to provide wound care, and "[d]enial of medically necessary pain management." (ECF No. 65, PageID.540.)

Currently before the Court are motions from summary judgment filed by two sets of defendants, both arguing that Plaintiff has failed to raise an issue of material fact regarding the alleged constitutional violations. (ECF Nos. 90, 92.) Briefing is complete and the case is ready for resolution.

### 2.    Summary Judgment Standard

When a movant shows that "no genuine dispute as to any material fact" exists, the court will grant his or her motion for summary judgment. Fed. R. Civ. P. 56(a). In reviewing such motion, the court must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp.*

*v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). In making its determination, a court may consider the plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the non-moving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493.

When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. The court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992). After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require

25

submission to a jury or whether it is so onesided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

### 3.  Section 1983 Claims

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate facts showing (1) the conduct about which he or she complains was committed by a person acting under color of state law and (2) the conduct deprived him or her of a federal constitutional or statutory right. In addition, a plaintiff must allege that he or she suffered a specific injury because of the conduct of a particular defendant and must allege an affirmative link between the injury and that defendant's conduct. *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).

### a.  Eighth Amendment Deliberate Indifference Standard

In *Estelle v. Gamble*, the Supreme Court held "that deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment's Cruel and Unusual Punishment Clause because it constitutes the "unnecessary and wanton infliction of pain" and is "repugnant to the conscience of mankind" by offending our "evolving standards of decency." 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 97, 104 (1976)). To establish a cognizable claim, Plaintiff's allegations must show Defendant's 'sufficiently harmful' acts or omissions. *Id.* at 106. "[I]nadvertent failure to provide adequate medical care . . . will not violate the Constitution." *Id.*

26

The "deliberate indifference" inquiry has objective and subjective elements. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The objective inquiry asks whether the deprivation was "sufficiently serious," which a claimant satisfies when his or her condition "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004) (citation omitted). The former standard focuses on the "effect of delay in treatment." *Anthony v. Swanson*, 701 F. App'x 460, 463 (6th 2017). In *Napier v. Madison Co.*, 238 F.3d 739 (6th Cir. 2001), the court held that a plaintiff "'must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed.'" *Id.* (citation omitted). This rule applies more broadly to claims "based on the prison's failure to treat a condition adequately." *Blackmore v. Kalamazoo Co.*, 390 F.3d 890 (6th Cir. 2004). The Sixth Circuit recently explained that

> when an inmate has received on-going treatment for his condition and claims that this treatment was inadequate, the objective component of an Eighth Amendment claim requires a showing of care "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)). The plaintiff must present enough evidence for a factfinder to evaluate the adequacy of the treatment provided and the severity of the harm caused by the allegedly inadequate treatment. There must be "medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013). This will often require "expert medical testimony ... showing the medical necessity for" the desired treatment and "the inadequacy of the treatments" the inmate received. *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017); *see Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (explaining that adequacy-of-care claims may require expert testimony "to create a genuine dispute that the prisoner's medical needs are

serious"). The plaintiff also must "place verifying medical evidence in the record to establish the detrimental effect" of the inadequate treatment.

*Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018).

The subjective inquiry, by contrast, considers whether official's state of mind was sufficiently culpable; it requires a showing that an official "'knows of and disregards an excessive risk to inmate health or safety[.]'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quotation omitted). "[T]he official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* Inferences from circumstantial evidence can suffice to satisfy the subjective showing. *Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017).

The Supreme Court examined the subjective prong in *Farmer v. Brennan*, 511 U.S. 825, 834-847 (1994). The subjective nature of deliberate indifference follows from the Eighth Amendment's principle proscription of "only the unnecessary and wanton infliction of pain," and focus on the defendant's culpability. *Id.* at 834 (citation omitted). The culpable state of mind, the Court said, was not ordinary negligence—cruel and unusual punishment is something more than run of the mill medical malpractice. *Id.* at 835; *see also Estelle*, 429 U.S. at 110. But not so much more that the defendant must intentionally or purposefully inflict injury. *Farmer*, 511 U.S. at 837. Instead, as noted above, the standard turns on whether the defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* The upshot, for present purposes, is that defendants who "responded reasonably to the risk,"

28

even if the potential harm subsequently eventuates, have not violated the Eighth Amendment. *Id.* at 844-845.

Courts are reluctant "to second guess medical judgments ," *Oliver v. Wolfenbarger*, No. 07-12672, 2008 WL 4387210, at *8 (E.D. Mich. Sept. 24, 2008) (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976)), and thus "differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnoses or treatment are insufficient to state a deliberate indifference claim," *Pettway v. Squier*, 2014 WL 4924302, at *3 (E.D. Mich. Sept. 25, 2014). "[A] desire for additional or different treatment does not suffice by itself to support an Eighth Amendment claim." *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014). Instead, when treatment is afforded, "the Eighth Amendment is violated if the care [was] '"so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."'" *Id.* (citation omitted). The treatment must be "so woefully inadequate as to amount to no treatment at all." *Mitchell*, 553 F. App'x at 604. Courts have accordingly rejected inadequate-treatment claims when the plaintiff received treatment but complained it was insufficient. *Bright v. Martin*, 37 F. App'x 136, 138 (6th Cir. 2002) ("In sum, it is clear that Bright received medical treatment for many years while incarcerated and has now concluded that he has a liver condition which Dr. Messany did not treat properly. Accepting Bright's allegations as true, they amount to a medical malpractice claim and not an Eighth Amendment claim."); *Powell v. Messary*, 11 F. App'x 389, 390 (6th Cir. 2001) ("An examination of the record shows that the defendants provided Powell with medical treatment for his condition, even though he may not have been satisfied with the treatment

that he received. . . . Under these circumstances, Powell has alleged no more than a medical malpractice claim that is not cognizable under 42 U.S.C. § 1983.").[11]

These standards apply to "a private entity contracted to perform the traditional state function of prison medical care." *Baker v. Stevenson*, 605 F. App'x 514, 520 (6th Cir. 2015).

### b.     Arguments and Analysis

#### i.     Defendants Trout, Zeigler, Borgerding, Wetzel, Vanbergen, Klee, DeLine, and Dunning-Meyers

The first motion for summary judgment—filed by Defendants Trout, Zeigler, Borgerding, Wetzel, Vanbergen, Klee, and Dunning-Meyers—"do not dispute that [Plaintiff] has a serious medical need and has thus satisfied the objective prong of the deliberate indifference test." (ECF No. 90, PageID.687.)[12] Instead, they focus on the subjective prong, arguing that they provided extensive care to Plaintiff by giving him "bandages, ointments, and medications," and helping apply the ointment to his back. (ECF No. 90, PageID.689.) Plaintiff's argument, they continue, amounts to a disagreement

---

[11] The "Eighth Amendment applies only after a formal adjudication of guilt," and thus does not extend to pretrial detention. *Walker v. Sharrar*, 2019 WL 3714494, at *2 (E.D. Mich. Aug. 7, 2019). But the Sixth Circuit "has made clear that, under the Fourteenth Amendment, pretrial detainees are 'entitled to the same Eighth Amendment rights as other inmates,'" and the same analysis applies to both types of claims. *Richko v. Wayne Co., Mich.*, 819 F.3d 907, 915 (6th Cir. 2016) (citation omitted). Recently, questions have arisen whether the subjective prong applies to Fourteenth Amendment claims concerning pretrial detention. In *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015), the Supreme Court held that the subjective prong does not apply to excessive force claims brought under the Fourteenth Amendment by pretrial detainees." Although this holding did not cover deliberate indifference claims, some courts have extended it to such claims. *See Love v. Franklin Co., Ky.*, 376 F. Supp. 3d 740, 746 (E.D. Ky. 2019). The Sixth Circuit, however, has noted the issue but not yet resolved it, instead applying both prongs. *See Powell v. Med. Dep't Cuyahoga Co. Correctional Ctr.*, 2019 WL 3960770 (6th Cir. Apr. 8, 2019); *Richko*, 819 F.3d at 915; *see also Wilber v. Co. of Jackson*, 2016 WL 892800, at *6 (E.D. Mich. Mar. 9, 2016) (noting post-*Kingsley* cases from the Sixth Circuit and other courts applying both prongs). As the Sixth Circuit has not yet addressed the matter, and neither party seeks an extension of *Kingsley*, I will follow current standards requiring both objective and subjective showing.

[12] Because these defendants do not challenge the objective prong, I will assume it has been satisfied for purposes of their motion.

concerning the adequacy of treatment and sounds in medical malpractice rather than Eighth Amendment deliberate indifference. (*Id.*)

Plaintiff responds by arguing that Defendant Trout "was deliberating indifferent in failing to even minimally monitor [Plaintiff's] chart and thus failed to act or even raise the fact that his wounds were not healing well and in fact getting worse." (ECF No. 112, PageID.2862.) His brief fails to mention Zeigler, Wetzel (aka Sigler), Vanbergen, or Klee, and he references Dunning-Meyers only once, noting that she "was the only provider recording [Plaintiff's] pain levels during this period (May-June 2015)" and citing two of those pain recordings. (ECF No. 112, PageID.2832-2833 (*citing id.*, PageID.2952, 2954.) The end of his brief refers generally to "Defendant nurses," asserting they "were deliberately indifferent in failing to provide or ensure twice daily cleansing and bacitracin application and scar massage and stretching on days [Plaintiff] did not have PT." (ECF No. 112, PageID.2862.)

To begin, Plaintiff's brief states that he will stipulate to Borgerding's dismissal, and he offers no argument regarding this defendant. (*Id.*) He has not yet stipulated to the dismissal but, given the lack of argument, I suggest that the claims against Borgerding should be dismissed.

Plaintiff's contentions regarding defendants Zeigler, Wetzel (aka Sigler), Vanbergen, Klee, and Deline are inadequate. Plaintiff must articulate claims "against each individual defendant—the collective acts of defendants cannot be ascribed to each individual defendant." *Reilly v. Vadlamudi*, 680 F.3d 617, 626 (6th Cir. 2012). Indeed, Plaintiff must prove their subjective state of mind, particularly their disregard of known

risks, *Harrison*, 539 F.3d at 518, which would be difficult to do when the defendant is not discussed at all. Thus, the "subjective component must be addressed for each [defendant] individually." *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

Here, Plaintiff's broad generalizations regarding the nursing care do not suffice to demonstrate the requisite state of mind for these defendants. He mentions that he was ordered to have "daily wound care," including cleansing and application of bacitracin, as well as scar massage and stretching. (ECF No. 112, PageID.2844.) He does not provide a citation for this assertion, but the order came from Dr. Whiteman on October 17, 2014: "wound care daily" and "scar massage daily, stretching, [Right upper extremity] + trunk." (ECF No. 112, PageID.3560.) A subsequent "wound care order clarification" the same day, apparently from a different provider, stated, "cleanse with NS; apply bacitracin to open areas BID," meaning twice a day. (*Id.*)

Plaintiff says "[n]one of that happened." (*Id.*) But as proof, he cites "Ex. 41 re scar massage & stretching were PT, not nursing." (ECF No. 112, PageID.2844 n.67.) There are a few problems with this citation. Most glaringly, Exhibit 41 is "[m]issing." (ECF No. 113, PageID.3565.) From what can be gathered from Plaintiff's explanation of the exhibit, it appears that it would have shown the scar massage and stretching were done at physical therapy, suggesting that the nurses did not complete these activities. Of course, the fact that these activities occurred at physical therapy does not mean, without more, that the nurses were not also completing them. Even so, Plaintiff does not allege that the nurses were the ones responsible for the massage and stretching and nothing in the record he apparently relies on suggests that either. (ECF No. 112, PageID.3560.) Nor does the missing citation

32

seem to say anything about wound care; instead, he appears to pin the constitutional violation on these defendants regarding inadequate wound care based on the fact that he had to apply the ointments to himself, with help only for his back, as well as his assertion "he was denied sufficient towels and bandages" and a mirror. (ECF No. 112, PageID.2844.) Again, however, the medical order Plaintiff most likely relies on does not state that the nurses must place the ointments on him. And he points to no other records showing he had any difficulty with that task; instead, as discussed in the facts above, the medical records show Plaintiff capable of applying bacitracin everywhere except his back. *See, e.g.*, (ECF No. 90, PageID.1504.)

More importantly, none of Plaintiff's contentions or his cited materials demonstrate that Zeigler, Wetzel (aka Sigler), Vanbergen, Klee, or Deline knew that failing to apply ointments all over (rather than simply helping place them on his back), provide more towels and bandages, or personally administer the massages and stretching posed a substantial risk of harm. Although the Court need not scour the record when the non-moving party fails to present evidence, *Street*, 886 F.2d at 1479-80, I would note that the record does not support Plaintiff's position. At his deposition, Plaintiff could not recall any actions taken by these defendants. (ECF No. 112, PageID.1421-1423; ECF No. 90, PageID.1877.) None of their reports indicate they knew that Plaintiff was struggling to apply the ointments—which he never expressly claims and which the records directly contradict—or needed massage and stretching, and knew the failure to provide these services posed a substantial risk of harm. To the contrary, the reports from these defendants generally indicate that Plaintiff was independent and applying the ointments (with no problems mentioned) everywhere except

33

his back, for which he received help. (ECF No. 90, PageID.1002, 1095, 1192, 1496, 1504, 1524.) And defendants offer an expert report that the nursing care here met professional standards. (ECF No. 90, PageID.1912-1933.) It would appear that DeLine and Wetzel, in particular, had little to do with any of this treatment. The former's only appearances in the record show her to have merely arranged the initial assessments of Plaintiff at DWH and to have generated a single document; the latter simply admitted Plaintiff to his room. (ECF No. 90, PageID.1524, 1527-1528; ECF No. 92, PageID.2122.)

Consequently, there was no evidence of these defendants' knowledge or of any substantial risk. The mere fact that these nurses may have seen open wounds on Plaintiff does not lead to an inference of knowledge. This is because Plaintiff has not argued or suggested that the mere existence of open wounds indicated a problem, *i.e.*, he has not adduced any evidence that adequately treated wounds would have closed or better healed by this point in his recovery. Likewise, he has failed to explain how the lack of towels, bandages, and nurse-administered ointments, massage, and stretching posed a risk of substantial harm. How much would these things have helped? This is important because his contentions all deal with marginal changes in his conditions—none of the defendants caused his burns, he asserts they merely failed to make his burns better. Thus, it is important to know how the sought-after treatments and services would have affected his condition. These considerations, at base, involve the sort of medical judgment that courts are unequipped to grapple with, especially when the parties present no argument or evidence elucidating the materials and concepts. *Cf. Oliver*, 2008 WL 4387210, at *8. For these reasons, I suggest that Plaintiff has not presented a question of material fact regarding the

subjective culpability of Zeigler, Wetzel (aka Sigler), Vanbergen, Klee, or Deline, and they should accordingly be dismissed.

The same goes for Dunning-Meyers, who was at least mentioned in Plaintiff's brief. But his brief discussion merely points out that she measured his pain level on a few occasions, finding that it was in a range 4 or 5 out of 10 that Hill thought was "acceptable." (ECF No. 112, PageID.2832-2833, 3064.) It is difficult to discern how this constitutes deliberate indifference. Nothing in her records suggest she disregarded knowledge of substantial risks. (ECF No. 90, PageID.828, 863, 889, 926, 957, 983, 1019, 1062, 1077.) She recorded that he could "complete self care of burns without difficulty," that he could use the bacitracin, that he went to physical therapy, that he stated in February and May 2015 that he had sufficient creams and bacitracin for his burns, that he could attend the "day room during out time," and that he received stretching and scar massage at physical therapy. (*Id.*) One note stated the "[d]rainage not confined by dressing," but this short observation alone does not suggest Dunning-Meyers was purposefully ignoring the need for more dressing or that this need posed a substantial risk of harm. (ECF No. 90, PageID.1019.) And, as with the other nurses above, Plaintiff could not recall Dunning-Meyers at his deposition. (ECF No. 90, PageID.1876-1877.) To the extent he meant to lump Dunning-Meyers with the other nurses above, his effort to create a triable issue fails for the same reasons his claims against those nurses failed.

This leaves Trout. Plaintiff has a little more to say about her, but it remains unconvincing. His claim against her centers on the allegation that "[i]nstead of healing as expected, he continued to have open, oozing wounds, with new areas opening up as skin

35

graphs failed," and that "[a]ll of this apparently went unnoticed by Defendant Trout, even though" she was charged with monitoring his wounds' progress. (ECF No. 112, PageID.2845.) He then states,

> She was supposed to consult on new and changing wounds. She claims to have done this by audits of his chart and found no fault. Ex. E indicates that floor nurses are to take daily measurements (perhaps not practical here) and monthly photographs. She testified that looking at those photographs and measurements was how she monitored the wound's progress. If she really had been monitoring his chart, at a minimum she might have noticed that there were no photos between his admission on 10/17/14 and 7/1/15. She claims she ordinarily reported such deficiencies to her supervisors but there is no evidence that was done with regard to the lack of photos of Lashuay. If her monitoring aroused any concerns that a wound was not progressing as it should, she testified she would normally bring that up to the provider and create a progress note of that contact. (*Id.*, p. 47) There are no such notes, even though the providers' and PT notes show that the wounds were not healing over a period of 6-7 months or more and in fact new wounds were opening and oozing. She testified that if she had been aware of new wounds opening up, if she had seen that in his chart, she would have talked to the provider(s). She never reviewed his treatment plan to make sure it was being complied with. (*Id.,* p. 65). She didn't know if he had one, even after she reviewed his chart in preparation for her deposition (*Id.,* p.66). Then she changed tact and asserted that her chart reviews did not include each entry in any particular patient's chart, just random entries. (pp. 82-83, 87, 88).

(ECF No. 112, PageID.2845-2846 (citations omitted).) This is the basis for his conclusion, noted above, that Trout "fail[ed] to even minimally monitor [Plaintiff's] chart and thus failed to act or even raise the fact that his wounds were not healing well and in fact getting worse." (ECF No. 112, PageID.2862.)

Plaintiff's argument fails to persuade. A large segment of his discussion focuses on the lack of photographs. He states that photographs should have been taken monthly, citing "Ex. E." for this proposition, and he suggests that had she been monitoring the chart she

would have observed and reported that photographs were not being taken monthly.[13] Trout did testify that she would have reported to her supervisors if photographs were missing but that she did not consider Plaintiff's records deficient. (ECF No. 92, PageID.2096.) More broadly, he suggests that the records contained enough information about his opening wounds that Trout should have known of his declining state.

Assuming that Plaintiff is correct, and no photographs were taken over the course of a few months, all he has shown is Trout's possible negligence in reading the records. He has not contended or shown that Trout knew of the missing photographs, as she testified otherwise. (ECF No. 92, PageID.2096.) Regarding the reports of his open wounds, he cites one record from physical therapy from December 2014 in which he self-reported that "new wounds continue to open up," (ECF No. 113, PageID.3567), and a portion of his deposition testimony concerning Nurse Hill, in which he stated that his wounds were "open and festering." (ECF No. 112, PageID.1401.) Regarding the latter, Trout could not have been aware in 2014 or 2015 of Plaintiff's deposition testimony from 2018—in other words, it was not a record which Trout could have ignored. Plaintiff's argument on Trout does not cite any other reports of open wounds or other conditions that Trout would have read and led her to conclude more treatment was required.

He has likewise failed to suggest that even had she known that photographs were not being taken or had read the reports of his still-open wounds, these materials displayed

---

[13] The reference to "Ex. E." is mistaken. Plaintiff organized his exhibits numerically, and it is apparent that he meant to cite Exhibit 71 (ECF No. 113, PageID.3689.) Exhibit 71 is an MDOC memorandum on wound care noting that "[t]he Floor/Treatment Nurse will be responsible to take monthly photographs." (*Id.*)

a substantial risk of harm that Plaintiff faced. That is, Plaintiff has presented no argument or evidence to the effect that the photography requirement or the reports of his open wounds were so critical to his care that the failure to follow up on either posed a critical risk to his health.

Presumably, he would claim that upon seeing the photographs Trout would have recognized his deterioration (perhaps by seeing his open wounds) and, from there, would have sought some form of increased or different care. This argument is premised not on inferences arising from evidence, but rather pure speculation that a jury could not reasonably credit based on what Plaintiff has currently offered: he has not explained, through medical evidence or otherwise, that new open or weeping wounds were abnormal in the months after an explosion, such that Trout (or any other medical professional) would have been aware his recovery was stalled or backsliding; and, assuming he has shown this, he has not taken the next by suggesting that any additional treatment would have placed his recovery back on track. Indeed, the only medical evidence regarding the persistence of open wounds after major burns comes from Dr. Vercruysse, who explained that "[i]t is common for patients to have open wounds for weeks to months and to have open wounds for weeks to months and to have recurrent wounds and sores." (ECF No. 92, PageID.2043.) Plaintiff has presented no medical or other evidence to the contrary, other than the bare fact that he continued experiencing wounds. Notice, too, that even if a factfinder would be permitted to construct this spiral of speculation, the end product would be a determination that Plaintiff sought different or alternative treatment than what he was provided, which is not a conclusion that generally supports a deliberate-indifference claim. *Hininger*, 553 F.

App'x at 605. This trail of conjectures becomes even more attenuated by the fact that Trout photographed Plaintiff's burns at the end of his time at DWH without, apparently, recording any observations of deteriorating wounds or ordering any new treatment. (ECF No. 90, PageID.746.)

Plaintiff would have a triable claim if he could demonstrate Trout's total failure to monitor a chart that would have alerted her to substantial risks due to deviations from Plaintiff's prescribed treatment plan. *Richmond v. Huq*, 885 F.3d 928, 939-940 (6th Cir. 2018). But as noted above, Plaintiff received daily care and none of the resulting reports from the nurses above expressly alerted Trout that Plaintiff needed additional treatment. Nor has Plaintiff demonstrated that his treatment plan was being flouted—Dr. Whiteman's order was being followed, as Plaintiff received stretching, massage, and medications. And, in these circumstances, failure to check medical records appears to be more akin to negligence than cruel and unusual punishment. *Cf. Sanderfer v. Nichols*, 62 F.3d 151, 155 (6th Cir. 1995) ("While perhaps in hindsight Jansen *should* have checked Clayton's medical history records, her failure to do so is negligence at most.").

For these reasons, I conclude that Plaintiff has not presented a triable issue concerning Trout, who should thus be dismissed from the case.

### ii.     Defendants Papendick, Whiteman, Hill, Larson, and Rais

### I.     Necessity for Medical Proof

This cadre of defendants disputes both the objective and subjective components of Plaintiff's claims. (ECF No. 92, PageID.1980-1994.) Regarding the objective prong,

defendants stress that in cases like this, where the plaintiff attacks the sufficiency of the treatment he received, medical proof of the treatment's inadequacy is needed, often in the form of expert testimony. (ECF No. 92, PageID.1981.) Here, defendants note that Plaintiff received significant medical care but has presented no expert witnesses or medical proof "that the provided treatment [he] received was not an adequate medical treatment of his condition or pain. . . . No verifying medical evidence in the record has been presented to establish any detrimental effect of inadequate treatment." (ECF No. 92, PageID.1983 (emphasis removed).) Defendants point out that they presented evidence from Plaintiff's physicians and other experts—Drs. Hettle, Morris, Stolz, and Yonick—that he was not harmed by the medical treatment he received while incarcerated nor the delay in obtaining the second surgery. (ECF No. 92, PageID.1984-1985.)

Plaintiff does not organize his analysis into objective and subjective segments. He does, however, state that "[t]hird degree burns over half the body present a serious medical need that does not require verified medical evidence." (ECF No. 112, PageID.2859.) He contends that "[a]bsent a need for expert testimony to establish a serious medical need, the Sixth Circuit does not require additional expert testimony." (ECF No. 112, PageID.2860.)[14] He then rejects defendants' reliance on *Napier*, which suggested the need for medical evidence:

> The defendants cited *Napier* . . . I believe, as part of their argument about our failure to provide medical proof. But if I understand our arguments

---

[14] In the previous paragraph, Plaintiff had stated that he "is not required to present expert," followed by a block quote from *Weaver v. Tipton Co.*, 41 F. Supp. 2d 779, 785 (W.D. Tenn. 1999). (ECF No. 112, PageID.2859-2860.) The quote, however, has nothing to do with the need for expert evidence—it instead deals with whether the defense of qualified immunity applied.

correctly, we're not saying that a delay in treatment or inadequate treatment *resulted* in a serious medical condition—the serious medical condition already existed and the defendants failed to treat it. So *Napier* may be inapposite here. See also, *Jackson v. Gibson*, [779 F. App'x 343] (6th Cir. July 2, 2019).

(ECF No. 2860.)

As for the individual defendants, Plaintiff alleges that Hill was deliberately indifferent by failing to provide adequate wound care, delaying his follow up at Hurley, delaying his requests for regrafting surgery, cutting his pain medication, and "failing to follow the ATP provided when she finally did submit a 407 request for the surgeries." (ECF No. 112, PageID.2861.) Larson was deliberately indifferent by reducing his pain medications. (*Id.*) Dr. Rais was deliberately indifferent by ignoring Plaintiff's requests for pain relief, "stopping all meaningful pain control," failing to follow proper procedures when doing so, and not sending Plaintiff to Hurley for the second surgery after pursuing alternatives. (ECF No. 112, PageID.2861-2862.) Dr. Papendick was deliberately indifferent in deciding that a second surgery was not medically necessary "contrary to the determinations of the 3 separate providers who submitted the 407s, despite his lack of expertise in burn care and failure to obtain any medical opinion to the contrary." (ECF No. 112, PageID.2862.) Finally, Plaintiff states that he will stipulate to dismiss Whiteman. (*Id.*)

To begin, Whiteman should be dismissed. Although Plaintiff has not yet submitted his stipulation, he offers no argument regarding Whiteman, giving the Court no basis to find that an issue of fact exists regarding whether this defendant was deliberately indifferent.

Turning to the merits, the threshold matter is whether this case falls under the *Napier* line of cases, thus mandating medical proof of his condition in order to satisfy the objective prong. I agree with Plaintiff to the extent he argues that medical proof under this caselaw does not always require expert testimony, and thus he was under no specific obligation to produce expert testimony. The case he cites, *Jackson*, the Sixth Circuit explained that "we have not always required the plaintiff's 'medical proof' to be expert medical testimony." 779 F. App'x at 346. Thus, Plaintiff's failure to produce an expert does not, without more, sink his case.

The more general question is whether he had to produce some form of "medical proof." Plaintiff suggests that medical proof is unnecessary because he's not claiming delayed treatment or inadequate care caused the serious medical condition. (ECF No. 112, PageID.2860.) The apparent assumption behind this argument is that the objective prong is satisfied by the mere existence of a serious medical condition, and that when the defendants do not cause the condition there is no need for medical proof regarding the adequacy of their treatment.[15] There is some loose support for these propositions. For example, the Seventh Circuit has stated the "objective component is the seriousness of the inmate's medical condition, and as [the plaintiff's] burn was objectively serious, that element of the test is satisfied." *Rivera v. Gupta*, 836 F.3d 839, 842 (7th Cir. 2016). And in *Jackson*, the Sixth Circuit suggested that its "medical proof" requirement is triggered

---

[15] Although Plaintiff phrases this portion of his argument as though the defendants' failed to treat his condition, his more direct allegations against the defendants (as noted above) make clear that he is addressing the adequacy of the treatment provided and the delays in treatment rather than an abject failure to provide any treatment.

"when a prisoner alleges that a delay in treatment or inadequate medical treatment *resulted* in a serious medical condition." 779 F. App'x at 346.

If Plaintiff's reading of the law were correct, then it would likely be the case that the presence of third-degree burns would satisfy the objective standard.[16] But this standard relates to the deprivation of care and not simply the presence of a serious medical condition. As the Sixth Circuit has noted, "The objective component requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the Eighth Amendment." *Rhinehart*, 894 F.3d at 737; *see also French v. Daviess Co., Ky.*, 376 F. App'x 519, 521 (6th Cir. 2010) (framing the issue as whether a medical need existed for a particular medication); *Blackmore*, 390 F.3d at 896 ("[T]he evidence need only show that 'the medical *need* at issue is sufficiently serious.'" (citation omitted)); *Sanders v. Sheahan*, 198 F.3d 626, 628 (7th Cir. 1999) (defining the objective standard as requiring a showing that "the alleged deprivation is 'sufficiently serious'" (citation omitted)). A serious medical condition, no matter the source, will carry "with it a serious medical need," and so the failure to provide any care is a serious deprivation. *Rhinehart*, 894 F.3d at 737. Conversely, if a serious medical need is adequately treated, then there has been no deprivation of medical care.

---

[16] Of course, in his "Legal Arguments" section, Plaintiff cites two inapposite cases to support the proposition that "[T]hird degree burns over half the body present a serious medical condition that does not require verified medical evidence." (ECF No. 112, PageID.2859 (*citing Pack v. Martin*, 174 F. App'x 256, 264 (6th Cir. 2006); *Preston v. Co. of Macomb*, 2019 WL 3315280 (E.D. Mich. July 24, 2019)).) *Preston* did not involve burns or suggest that such an injury alone sufficed. *Pack* did involve third-degree burns, but the holding there was not that the burns were enough, without more, to satisfy the objective prong. 174 F. App'x at 258-259. Moreover, although Plaintiff did not disclose this, his pincite to *Pack* lands in Judge Clay's partial dissent, not the majority opinion. *Id.* at 264 (Clay, J., concurring in part, dissenting in part). Thus, none of the caselaw Plaintiff presents holds that the mere existence of third-degree burns is enough to absolve a plaintiff of the need to present medical proof.

When the inmate disputes the care he received as insufficient, the court is faced with examining the adequacy of the care and any harm the treatment (or lack thereof) may have caused. *Id.* Under the Sixth Circuit caselaw, this showing is triggered by an allegation of inadequate treatment—such an allegation will, without more, require the court to consider whether the provided treatments were enough, which turns on medical proof about the necessity of various treatments and the effect of inadequate treatment. In other words, when some treatment was given but the plaintiff wanted more, a court will almost always need medical proof to measure the seriousness of depriving the plaintiff of the incremental treatment. This need will occur whether or not the serious condition predated the inadequate treatment or was caused by it.

When the need for treatment is obvious, no such medical proof need be submitted; but "[t]he obviousness standard refers to a doctor's attention, and thus is primarily applicable to claims of denial or delay of *any* medical treatment rather than claims that a plaintiff was denied or delayed in receiving a *specific type* of medical treatment." *Blosser v. Gilbert*, 422 F. App'x 453, 460 (6th Cir. 2011). For example, in *Anthony v. Swanson*, 701 F. App'x 460, 463-464 (6th Cir. 2017), the court noted that the plaintiff had a serious medical condition and received treatment for it. The "gravamen of [the plaintiff's] complaint concerns the sufficiency of his treatment," specifically, the plaintiff's desire for more aggressive treatment in the form of a surgery. *Id.* at 464. This argument was enough to require medical proof, especially of the medical need for the surgery. *Id.*; *cf. Cobbs v. Pramstaller*, 475 F. App'x 575, 580 (6th Cir. 2012) (noting that verifying medical proof is

44

required when the complaint concerns "a determination by medical personnel that medical treatment was unnecessary" (citation omitted)).

The same is true here: Plaintiff had a serious medical condition and received treatment for it; the heart of his claim is that the treatment was not enough. Thus, Plaintiff needed to produce the "medical proof" concerning the inadequacies of his care and the medical necessity of additional care.

Plaintiff's allegations of inadequate treatment fall under three broad categories—wound care, pain medications, and surgery—which I will use to organize the following analysis. At the outset, I would note that the Court has already determined in this case that Plaintiff's similar allegations of inadequate wound care and pain medication merely quibbled with the adequacy of treatment and therefore did not allege constitutional violations. *Lashuay v. Delilne*, 2018 WL 1744794, at *6 (E.D. Mich. Apr. 11, 2018). For the reasons that follow, although the present matter involves a motion for summary judgment concerning related claims, I see no reason to depart from the Court's basic conclusion.

## II.    Inadequate Wound Care

The first area is inadequate wound care. Of the defendants to the present motion, (ECF No. 92), only Hill is charged with inadequate wound care, although Plaintiff brings briefly brings Dr. Larson into the mix in his factual discussion of the inadequate wound care. On this topic, Plaintiff does not describe any medical evidence of adequate treatment for his conditions, how Hill or Dr. Larson deprived him of that treatment, and what effect this deprivation had on his health. He mentions that none of the DWH staff had specific

training with burn wounds, and that Hill supposedly told Plaintiff that she "she had no idea how to take care of him." (ECF No. 112, PageID.2843.) But without any evidence regarding the necessary medical treatment, the Court cannot determine whether the absence of burn specialists deprived him of needed treatment; and her alleged statement does not show the level of care she actually provided.

He further notes that "Hill consulted Larson, Whitehead and all the other physicians and mid-levels at DWH about how to care for the wounds, but oddly, not Trout." (ECF No. 112, PageID.2845.) Again, however, he does not specify any medical evidence that consulting with Trout was needed to provide adequate care, nor is it clear how this lack of consultation resulted in any harm or risk of harm: by Plaintiff's own evidence—the memo on the responsibilities of wound care nurses, which was Trout's position—Trout was "not a treatment nurse." (ECF No. 113, PageID.3689.)

Next, Plaintiff says that Hill used "Aquacel, a covering which sticks to the wound and stays on for several days." (ECF No. 112, PageID.2845.) He notes after his December 2014 follow up, Hurley "instructed him to continuously remove the slough and scabs and avoid products like Aquacel, which Hill then discontinued, citing Hurley's instructions." (ECF No. 112, PageID.2847-2848 (*citing id.*, PageID.3029-3028, 3050; ECF No. 113, PageID.3578-3587).) As Hill explained at her deposition, Hurley wanted the slough removed and "the Aquacel wasn't helping to do that," so they discontinued it; "a lot of times we . . . changed plans because one thing works; one thing doesn't work." (ECF No. 113, PageID.3050.) She did not recall Hurley specifically asking her to stop the Aquacel, (*id.*), and Plaintiff has not pointed to any such instruction.

Plaintiff does not articulate an exact argument regarding Hill's use of Aquacel, ending his discussion instead by stating, "Interestingly, Hill and Larson knew the slough was not supposed to be allowed to accumulate in the burn wounds. Unlike the Hurley nurses, they just did not know how to get it done." (ECF No. 112, PageID.2848 (*citing id.*, PageID.3024-3028, 3137-3138).) The cited materials—Hill's and Dr. Larson's depositions—hardly establish medical proof of adequate care and their failure to provide such care. Hill testified that they attempted to scrub the slough from his wounds—the procedure he had at Hurley in December—but he resisted; they then tried other methods like lidocaine and Aquacel, neither of which worked. (ECF No. 112, PageID.3024-3028, 3050.) Dr. Larson testified that keeping the wound areas clean and free from detritus was optimal. (ECF No. 112, PageID.3137.) No factfinder could glean from these depositions a medical standard so clearly against applying Aquacel that its use here deprived Plaintiff of adequate treatment. Nor has Plaintiff pointed to medical evidence demonstrating the deleterious effects Aquacel had on his condition.

In his factual discussion of the inadequate wound care, Plaintiff does not mention any other acts or omissions by Hill or Dr. Larson.[17] Consequently, I conclude that any claims against them based on inadequate wound care should be dismissed.

---

[17] Tucked at the end of his section on wound care, he writes that after his December 2014 follow up at Hurley, "Hill claims she waited a long time to get their [*i.e.*, Hurley's] reports. In fact, she did not visit [Plaintiff] for a month, at which time [Plaintiff] gave her his copy." (ECF No. 112, PageID.2848.) As evidence, he cites her deposition testimony that "after his appointment, I waited for documentation to come back. . . . I waited about four weeks. The next time I saw him, I said, I'm still waiting for paperwork from Hurley," at which point he "pulled it out of his locker and handed it to me." (ECF No. 112, PageID.3028.) It is unclear whether Plaintiff means to highlight this event as an example of unconstitutional wound care. If so, however, the argument would fail. Once again, no medical evidence is presented about proper procedures in these circumstances—would four weeks have been too long to wait after a follow up, especially when Plaintiff had the materials and could have provided them? And Plaintiff offers no medical evidence

### III.     Inadequate Pain Medication

Plaintiff's second category of inadequate care involves Plaintiff's pain medication and implicates defendants Hill, Dr. Larson, and Dr. Rais. As a global matter, a complete failure to prescribe pain medications, when those medications are shown to be necessary, can constitute a sufficient deprivation of medical care. *See Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991). But as can be seen from the facts above, that is not what Plaintiff claims. He received a long course of treatment with pain medications, which were adjusted throughout his stay. His complaint instead is that these defendants reduced or ceased certain medications that he needed. (ECF No. 112, PageID.2861-2862.) As a result, under the caselaw above, to meet the objective standard he needed to present medical proof that the treatment he received was inadequate. Such a showing here would have entailed proof of his need for certain medications or dosages and the effects of not getting them.

There is no medical evidence from a physician or other medical source that he required any particular medication or dosage. To the contrary, the evidence all suggests that the tapering which occurred was standard practice or at least had some medical rationale that Plaintiff has failed to counter with opposing medical evidence. Hill, for example, noted that the hospital does not regularly prescribe methadone because it posed

---

regarding the effect any delay had on his condition. Without such evidence, the Court cannot credit Plaintiff's (possible) argument. *See Anthony*, 701 F. App'x at 463-464.

Additionally, in a section captioned "Legal Arguments," which is heavy on caselaw and light on application to the facts of this case, he writes, "Nursing failure to provide prescribed dressing changes . . . is actionable under long held Sixth Circuit jurisprudence. *Boretti v. Wiscomb*, 930 F.2d 1150, [*sic*] (6th Cir. 1991)." (ECF No. 112, PageID.2859.) Nowhere does Plaintiff expressly accuse Hill or Dr. Larson of depriving him of dressings, so his statement regarding dressings is irrelevant here. In any event, the analysis above of the nurses' conduct dispenses with the argument that he was shorted dressings, and even if he were, his predicament would not have been akin to that faced by the plaintiff in *Boretti*, 930 F.2d at 1154, who "was denied any dressings for the wound or pain medication."

48

risks; although she failed to recall specific examples of risks, Dr. Whiteman testified that methadone was not an efficient drug. (ECF No. 112, PageID.3004-3005; ECF No. 92, PageID.2225-2226.) Dr. Borgerding testified that narcotics were highly addictive, and studies had failed to show much benefit. (ECF No. 112, PageID.2909.) Hill and Whiteman also testified regarding the objective signs they used to assess complaints of pain, including functional abilities. (ECF No. 112, PageID.3063-3064; ECF No. 92, PageID.2227-2228.) Dr. Larson and Dr. Rais noted that tapering was optimal and measured in part by functionality. (ECF No. 112, PageID.3143-3145; ECF No. 92, PageID.2198-2199.) In addition to these materials, defendants have presented the expert report from Dr. Stolz concluding that the adjustments to Plaintiff's pain medications were "warranted" and that there was no delay in pain management. (ECF No. 92, PageID.2029-2030.)

Plaintiff has not offered any countervailing medical evidence that would create a material issue of fact by indicating that the above evidence was incorrect, and the necessary course of treatment required different or more medications. And while he has presented reports of his own complaints of pain, he has not given the Court medical evidence suggesting that the pain was causally connected to the lack of any medication or dosage, *i.e.*, he has not shown that the desired treatments would have remedied his issues or that any pain reduction they could have offered outweighed the possible side effects. Plaintiff offers no evidence that could lead a factfinder to reasonably conclude that the defendants struck the wrong balance between the medication's benefits and side effects. Thus, there is no question of fact regarding whether the defendants' handling of pain medications was

inadequate enough to violate the Eighth Amendment. His claims thus fail on the objective prong and should be dismissed.

Even if he passed the objective standard, his claim would founder on the subjective showing, which is where his brief seems focus (although, as noted, his substantive discussion does not divide the analysis between the two prongs). As the Sixth Circuit recently explained,

> There are occasions when an official has a subjective, good-faith belief that a particular response to a prisoner's substantial risk of serious harm might either 1) fail to mitigate the risk or 2) create or enable a different substantial risk of serious harm to the prisoner. In those situations, an official's decision not to authorize that particular response cannot be considered an act of deliberate indifference, and we are mindful of the possibility that a reasonable response to a risk may not be able to avert the ultimate harm.

*Baker*, 605 F. App'x at 519. In *Stevenson*, the court discussed a line of its caselaw rejecting claims that the defendants were deliberately indifferent when they refused to prescribe (or they weaned the plaintiffs off of strong pain medications, particularly where evidence existed that the plaintiff was a substance abuser who was requesting opiates or narcotics. *Id.* at 519-520. Included in these cases was *Moses v. Coble*, 23 F. App'x 391, 392 (6th Cir. 2001), which stated, "A cursory reading of Moses's complaint reflects that he is dissatisfied with the defendants' decision to respond to his back pain with over-the-counter medications. This dissatisfaction does not implicate Eighth Amendment concerns." In another case, *French v. Daviess Co., Ky.*, the court acknowledged that the plaintiff might have had a serious medical need for Xanax, but that it was an addictive medication and "[w]here the question is one of administering a highly addictive drug on a continuing basis

in the prison setting, the prison staff should have some discretion; and we do not think that the [medication] substitute meets the standard of an 'unnecessary and wanton infliction of pain' under *Estelle v. Gamble*." 376 F. App'x at 522.

In light of these cases, the court in *Baker* found that the defendants' concerns about the plaintiff's "possible substance abuse and the impropriety of continued treatment with his preferred medication," along with the plaintiff's failure to proffer evidence of adequate treatment, rendered it "impossible for a reasonable juror to conclude that any of the individual defendants knowingly chose a course of treatment that was so 'woefully inadequate' as to be subjectively indifferent to the serious medical needs of [the plaintiff]." *Baker*, 605 F. App'x at 520. The court noted, too, that the defendants gradually reduced the narcotic medication rather than abruptly stopped it. *Id.*; *see also Matje v. Zetos*, 2015 WL 1510554, at *2 (E.D. Mich. Mar. 25, 2015) ("[F]ederal courts have repeatedly held that the Eighth Amendment does not guarantee a prisoner the right to be treated with any particular medication . . . and thus Plaintiff fails to state a plausible claim when he alleges that Defendants refused to prescribe and/or provide Oxycodone.").

The same basic facts appear in this case. As can be seen from the facts above, the reductions in Plaintiff's medications were gradual and reflected concerns about substance abuse, as well as the evidence of Plaintiff's functioning indicating he did not need the higher doses or stronger drugs. (ECF No. 90, PageID.815, 1828, 863, 898, 926, 957, 983, 1019, 1062, 1077, 1095; ECF No. 92, PageID.2226-2228; ECF No. 112, PageID.2909, 3063-3064, 3143-3145, 3162-3163.) Given this evidence, and Plaintiff's failure to produce medical proof he needed more robust medications, I cannot conclude that the defendants

were aware of a need for different pain medications and disregarded the risks associated with that need.

Plaintiff's arguments to the contrary are unpersuasive. He contends that in June 2015, "Hill summarily reduced [Plaintiff's] pain medications, noting simply that he appeared to be functioning well – ambulating well and performing his activities of daily living (ADLs) independently." (ECF No. 112, PageID.2832 (*citing id.*, PageID.2945).) He notes that his functioning had been at that level for a long time, precisely because of the pain medications, and that the reduction was ordered without a pain assessment.[18]

But Hill's action was not a summary stoppage, as Plaintiff implies, but instead a gradual reduction—the report he cites states that "[p]ain medications will begin to be weaned now as [Plaintiff] is functioning well at this time." (ECF No. 112, PageID.2945.) Plaintiff presents no evidence that would lead a factfinder to conclude that the pain medications were what was enabling his functioning, nor has he shown that gradual weaning posed a significant risk that Hill disregarded.

Conversely, he implies that the timing display's the arbitrariness of the reduction because he had been functioning well for a while; but as discussed above, the only evidence in the record is that functioning is an indication of improvement and can trigger medication reductions. Nothing is offered to support Plaintiff's apparent assumption that a stable level of improved functioning over the course of months fails to justify a pain reduction.

---

[18] Plaintiff also speculates that "Hill's reduction of [his] pain medication appears to be in clear retaliation for his refusing to drop his requests for the recommended surgery." (ECF No. 112, PageID.2832.) He quickly moves on from this point, as he should: it lacks any evidentiary support and is pure conjecture. Indeed, at the same time she began reducing his medications in June, she also submitted the 407 request for his surgery. (ECF No. 90, PageID.815; ECF No. 112, PageID.3043-3044.)

Some of the same problems occur in his discussions of Dr. Larson's management of his pain medications. He asserts that she reduced his medications without evidence that his pain had subsided and without recording pain assessments, among other things. (ECF No. 112, PageID.2834.) But, as with Hill, she believed that he was functioning properly at the time. (ECF No. 112, PageID.3162-3163.) She reduced or stopped other medications due to his urinary issues, noting that the changes were a trial to see how he responded and that his pain was being monitored. (ECF No. 112, PageID.3158-3159.) This is not evidence that she disregarded a substantial risk of serious harm; rather, it shows she adjusted medications to accommodate his various symptoms, knowing that he was closely monitored. For similar reasons, her stopping the lidocaine was not problematic: although Plaintiff argues that Dr. Larson could not recall why she stopped his lidocaine, she knew that he would be reevaluated at the C Unit (ECF No. 112, PageID.3160), and just two weeks later, Dr. Rais's order for lidocaine was rejected. (ECF No. 92, PageID.2206.)

Plaintiff also charges that both Dr. Larson and Dr. Rais violated MDOC policies because they did not offer clinical reasons for changing his treatment plan (by reducing the medications) or seek approval from higher-ups. (ECF No. 112, PageID.2835, 2839.) This argument stems from a "Pain Management Committee Charter," dated April 25, 2012. (ECF No. 112, PageID.2869.) Plaintiff highlights the Charter's statement that a "Pain Control Plan must be followed by all providers unless there are clinical reasons to vary from this plan," and when those reasons occur, "the case shall be referred to the RMO, RMD or the CMO for immediate recommendations until the case can be re-discussed at a subsequent [Pain Management Committee] meeting." (ECF No. 112, PageID.2870.)

Plaintiff's reliance on the Charter does not create a triable issue. For starters, it is not clear that this Charter applied to DWH or the C Unit. Moreover, Plaintiff does not present evidence that the medication changes fell within the Pain Control Plan referenced in the Charter. No Pain Control Plan has been placed into evidence. Hill and Dr. Rais testified that a treatment plan—which may or may not have been the same as the Pain Control Plan, as no clear evidence has been offered or discussed regarding the matter[19]— was revised as necessary by whichever medical provider saw the patient. (ECF No. 112, PageID.3003; ECF No. 92, PageID.2197.) In any event, the Charter does not state that the clinical reasons must be entered into the documentary record, and both Dr. Larson and Dr. Rais provided reasons either in their paperwork or at their depositions.[20] And it is unclear why Plaintiff believes the RMO, RMD, or CMO was not contacted. He fails to flag any affirmative evidence to that effect.

For these reasons, I conclude that Plaintiff has presented no triable issue concerning the pain medications.

## IV.    Contracture Release and Skin Regrafting

Plaintiff's final argument is a closer question. It concerns defendants' failure to provide the contracture and regrafting procedures recommended by Dr. Morris. Although "a prison doctor is not deliberately indifferent to a prisoner's serious medical needs solely

---

[19] Dr. Rais said that new patients received a "pain control plan," which was written in the progress notes and which "any physician can come to" after diagnosing the patient. (ECF No. 92, PageID.2197.) It is unclear whether the plan Dr. Rais referred to was the same as the Pain Control Plan mentioned in the Charter.

[20] Plaintiff's parsing of these reasons, as I discussed earlier (*e.g.*, Dr. Larson provided no pain assessment or had no reason to stop medications due to urinary issues) simply invites the Court to "second-guess the medical judgments of medical personnel." *Baker*, 605 F. App'x at 519.

because she does not follow a private physician's recommended course of treatment," *Coonrod v. Sherman*, 2018 WL 4855294, at *19 (W.D. Mich. Sept. 18, 2018), *rep. & rec. adopted by* 2018 WL 4852213 (W.D. Mich. Oct. 5, 2018), "the failure to provide the prescribed plan of treatment may form the basis of a claim for deliberate indifference," *Richmond*, 885 F.3d at 940-941.

If construed as a failure to provide any care, Plaintiff's claim regarding the surgery would not fall within the medical-proof requirement discussed above. Such a finding, however, is unnecessary because even if the proof requirement applies, I would conclude that the record contains sufficient medical proof of the need for the surgery. Most important, Dr. Morris, who treated Plaintiff's burns after the explosion, recommended the contracture release and regrafting procedures.[21] Dr. Hettle, who also treated Plaintiff at Hurley in 2014, also believed contracture release surgery would be necessary. (ECF No. 92, PageID.2010.) What's more, both Hill and Dr. Rais filed 407 requests for the procedures, (ECF No. 90, PageID.815; ECF No. 98, PageID.2663, 2673; ECF No. 92,

---

[21] Plaintiff contends that this recommendation was for *immediate* regrafts. (ECF No. 112, PageID.2849.) He believes this because the handwritten note Dr. Morris apparently provided to DWH recommended "(1) re-do skin grafts to unhealed areas, . . . (3) contracture release will be required in future . . . ." (ECF No. 113, PageID.3571.) Nothing expressly required immediate regrafting; Plaintiff discerns such a requirement only in context with the recommendation for contracture release in the future. Whether this is the most reasonable reading of the document is disputable. It becomes less plausible, however, when compared to Dr. Morris's contemporaneous notes about his recommendations, in which he said that "[A]t some point in the future months, he will benefit from contracture release and regrafting. Quite likely it would be useful to use Integra on these. However, this should wait until all of the small residual open areas are healed." (ECF No. 98, PageID.2586.) Regardless of Dr. Morris's intended meaning, by June 2015 defendants began considering that Plaintiff was ready for the surgery per Dr. Morris's recommendations, thus any delay for the healing of Plaintiff's open wounds was inconsequential—the event triggering Dr. Morris's recommendation had occurred. (ECF No. 112, PageID.2990.) Moreover, the issue is not the delay in the surgery but the fact that it never occurred, and defendants have not suggested that any delay of the surgery pursuant to Dr. Morris's recommendation gave them too little time to schedule a surgery prior to Plaintiff's 2016. Instead, the record contains enough evidence that the attempts to obtain the surgery—which he could undergo during his time at the C Unit— eventually stopped, not for lack of time.

PageID.2207-2208; ECF No. 112, PageID.3043-3044), which appears to indicate their belief that the procedures were medically necessary. (ECF No. 112, PageID.3398 (Dr. Whiteman's testimony that he understood all doctors used 407 requests only for medically necessary treatment).) Then, of course, after prison he underwent the surgery for contracture release and skin regrafting. (ECF No. 113, PageID.3661; ECF No. 114, PageID.2491-2492.) Even later, he still needed "aggressive OT and physical therapy," according to Dr. Yonick. (ECF No. 113, PageID.3667-3687.)

It is true that evidence exists—mostly in the form of expert reports or affidavits—indicating the delay in the surgery did not cause harm. Dr. Morris merely averred that "[i]t was not too late" for the procedures in 2016. (ECF No. 90, PageID.1942.) That might indicate that the procedures could still be effective after Plaintiff left prison. But that conclusion cuts both ways—perhaps the lack of an earlier surgery in prison did not harm Plaintiff over the long run, but the fact that the procedures could be effective suggests that an earlier surgery would have provided him increased functionality or relief (or whatever Dr. Morris meant by effectiveness) while still in jail. At the very least, then, Dr. Morris's statement does not weigh against the possibility that more timely procedures would have provided benefits to treat this serious medical need. *Cf. Richmond*, 885 F.3d at 938 ("Richmond's burn was serious enough to require a skin graft after her release."). Dr. Stolz testified more directly that the delayed resulted in "no harm." (ECF No. 92, PageID.2030.) While he said delays of a few months or even over a year were common, the delay here lasted two years, until September 2016, when he was released from prison. (ECF No. 92, PageID.2042-2043.) Thus, by his own testimony, this delay was unusually long. And

recall, this was not a simple delay, with the defendants eventually providing the service: they never did, and he received it only on his own initiative.

Regardless, the fact that Plaintiff might have eventually received treatment in time to benefit from it does not negate the pain or loss of function he might have experienced prior to the treatment—and given the evidence that he needed the procedures, it is reasonable to conclude that at least some of his suffering and physical difficulties in prison flowed from the lack of surgery. *Cf. Boretti*, 930 F.2d at 1154 ("The fact that the wound did not become infected and healed properly does not indicate that plaintiff did not endure physical pain and mental anguish during the time he was denied any dressings for the wound or pain medication."). Indeed, while in prison, his right hand was clawed, and his motions were restricted. *See, e.g.*, (ECF No. 90, PageID.757.)

For these reasons, I conclude that sufficient medical proof demonstrates his serious medical need for the contracture release and skin regrafting. Accordingly, Plaintiff has satisfied the objective standard. What remains is the subjective standard, which must be evaluated with regard to each individual defendant. *See Reilly*, 680 F.3d at 626.

Beginning with Hill, she was the first defendant to seek authorization the procedures. (ECF No. 98, PageID.2631.) Only a month later, Plaintiff was transferred out of her care at DWH and into the C Unit. (ECF No. 98, PageID.2649.) After that point, Hill dropped out of the records. From this evidence, it is apparent Hill believed the procedures were necessary or justified and she took the only steps apparently within her power to see that the procedures occurred. *See* (ECF No. 112, PageID.3398.) There is no evidence she played any role in the subsequent events, namely the fruitless search for an alternative

surgeon. Thus, she acted to arrange fulfillment of a known medical need. Consequently, it cannot be said that she disregarded a known risk. Plaintiff has not presented a triable claim against her regarding the surgery.

Dr. Larson played an even more limited part. Her medical reports and transfer summary show that she knew of Hurley's recommendation that Plaintiff should have the procedures. (ECF No. 98, PageID.2651, 2655.) Apparently, she talked with Dr. Papendick in late June 2015 about securing an alternative location or surgeon for the procedures. (ECF No. 98, PageID.2655.) The matter was "still in question" when Plaintiff entered the C Unit. (*Id.*) As such, she knew of the medical need but did not disregard it, as efforts to secure the procedures were ongoing when she dropped out of the picture.

The story is different from Dr. Rais and Dr. Papendick. Both of them understood the need for the procedures. As noted above, Dr. Rais submitted requests for them and for consultations with alternative surgeons. (ECF No. 98, PageID.2663, 2673; ECF No. 92, PageID.2207-2208.) Dr. Papendick said he would have approved a request to send him to Hurley, but never received such a request. (ECF No. 92, PageID.2157-2158.)

By not arranging for the procedures, these two defendants could be found to have disregarded a known medical need. It is true that they sought an alternative to Hurley. But when that option was unavailable, their efforts petered out even as they failed to make any further medical determination that Plaintiff no longer needed the procedures. On November 12, 2015, five months after Hill submitted her request and the search for alternatives commenced, Dr. Rais concluded that no other surgeons were available. (ECF No. 98, PageID.2732; ECF No. 92, PageID.2210-2211.) For most of that period, the responsibility

58

for Plaintiff's care had rested with Dr. Rais. The pursuit of a non-Hurley surgeon lasted surprisingly long considering, as Dr. Rais himself noted, "there are not many plastic . . . surgeons who do this and choice is limited." (ECF No. 92, PageID.2210.)

Regardless of whether Dr. Rais dithered, once the pool of options dried up, he did not reconsider or recontact Hurley. (ECF No. 92, PageID.2212.) It appears that nobody spoke with Hurley about reducing the 30-day post-procedure stay that was the ostensible sticking point in having the procedures done at Hurley. Dr. Rais testified that he recalled Hurley having been officially ruled out, although he did not remember any specifics of this decision. (ECF No. 92, PageID.2212-2213.) So Dr. Rais knew of the need for the procedures and was aware of a surgeon who would perform them, but when other surgeons were unavailable he simply dropped the matter, despite failing to register any change in the need for surgery.

Dr. Papendick's portrayal of having his hands tied by the lack of requests for surgery at Hurley is unconvincing. Hill originally submitted a general request for the surgeries, which he rejected in favor of his alternative plan; Dr. Rais likewise submitted a request, albeit a more specific one, for the procedures, which again led to a search for some alternative to Hurley. He provides no explanation for why, when the non-Hurley option failed, he was prevented from revisiting Hurley. Even assuming that somehow the requests had expired and he lacked authority to revive and approve them—and that this lack of technical authority within the MDOC hierarchy somehow would somehow absolve him from failing to act on a known medical need—nothing prevented him from consulting with

59

Dr. Rais or another provider and soliciting a request for the procedures to occur at Hurley, which he said he would have approved.

A factual dispute also arises regarding the reasons offered for declining Hurley as the site of the procedures. Dr. Papendick said that cost was not a factor in his decision-making; rather, the concern with sending Plaintiff to Hurley was public security. (ECF No. 92, PageID.2152, 2156-2159.) Yet, Dr. Papendick undercut this by noting that security was just a consideration, and it would not control his decision. (ECF No. 92, PageID.2152-2153.) Thus, the only reason he gave for his decision was based on a factor that he himself said would not dictate the decision. Moreover, Plaintiff would have had two guards at all times in Hurley, according to Hill's testimony." (ECF No. 112, PageID.3041.) Was there some reason to think that two officers might not be enough to protect the public against a post-surgery patient with severe burns covering half his body?

If security concerns were not the determinative factor, what was? Dr. Larson divulged an alternative in her transfer paperwork, memorializing a discussion apparently attended by Dr. Papendick where the expense of Hurley was raised and it was noted that a different surgeon was sought because "the cost of staying inpatient [at Hurley] would be a large amount." (ECF No. 98, PageID.2655.) Prison officials cannot base a delay or denial of treatment of a serious medical need solely on non-medical reasons but can consider the costs versus the benefits of a procedure. *Pettway v. Squier*, 2014 WL 4924302, at *6 (E.D. Mich. Sept. 25, 2014). "The lower the cost, the less need has to be shown, but the need must still be shown to be substantial." *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999). There is no evidence that Dr. Papendick or Dr. Rais ever engaged in this careful

balancing or that, if they did so, the scales reasonably tipped against the procedures. In fact, Dr. Papendick said he would have approved the Hurley request, so he must have thought the costs justified the benefits. Dr. Rais believed Hurley had already been ruled out but could not recall the specific discussion giving rise to this belief. And neither attempted to negotiate down the costs with Hurley (by reducing the post-procedure stay). Thus, a factfinder could reasonably conclude that these defendants disregarded Plaintiff's serious medical needs.

For these reasons, I conclude that Plaintiff's claims against Hill and Dr. Larson regarding the surgery should be dismissed, but that he has raised an issue of material fact with respect to whether Dr. Rais and Dr. Papendick violated his Eighth Amendment rights by failing to arrange for contracture release and skin regrafts.

### C.    Conclusion

For the reasons above, I recommend that the Court:

- **GRANT** the motion of defendants Trout, Zeigler, Borgerding, Sigler, Vanbergen, Klee, Dunning-Meyers, and Deline (ECF No. 90); and

- **GRANT in PART and DENY in PART** the motion of defendants Papendick, Whiteman, Hill, Larson, and Rais, dismissing all claims and defendants except the Eighth Amendment claims against Dr. Papendick and Dr. Rais for failing to arrange Plaintiff's surgery.

## III.  <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed.

R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 22, 2020                            S/ PATRICIA T. MORRIS
                                                   Patricia T. Morris
                                                   United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 22, 2020                              By s/ Kristen Castaneda
                                                    Case Manager