UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KEN LASHUAY, *Individually*
*and as a Personal Representative*
*of the Estate of David Lashuay*

     Plaintiff,       Case No. 17-cv-13581

v.             District Judge Thomas L. Ludington
              Magistrate Judge Patricia T. Morris

RN LORRAINE VANBERGEN, et al,

     Defendants.

_____/

**ORDER ADOPTING IN PART REPORT AND RECOMMENDATION, OVERRULING PLAINTIFF'S OBJECTIONS, SUSTAINING DEFENDANTS' OBJECTIONS, GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DISMISSING SECOND AMENDED COMPLAINT**

On November 1, 2017, Plaintiff David Lashuay filed a complaint against a variety of medical staff and medical providers alleging that they were deliberately indifferent to his medical needs while he was incarcerated by the Michigan Department of Corrections.[1] ECF No. 1. On November 10, 2017, and before any Defendants were served, Lashuay filed an amended complaint which made minor factual clarifications and corrected several clerical errors. ECF No. 4. On April 27, 2018, Lashuay filed a second amended complaint after receiving leave to do so. ECF No. 65.

The next week, all pretrial matters were referred to Magistrate Judge Patricia Morris. ECF No. 68. Defendants filed motions for summary judgment the next year. ECF Nos. 90, 92. Magistrate Judge Morris issued a report recommending that the motions be granted in part and

---

[1] Lashuay died in April 2019. His father, Ken Lashuay, was appointed the personal representative for his estates and was substituted as Plaintiff in this action on September 11, 2019. ECF Nos. 108, 109.

denied in part. ECF No. 120. Specifically, she recommended that Plaintiff's claims against Defendants Trout, Zeigler, Borgerding, Sigler, Vanbergen, Klee, Dunning-Meyers, DeLine, Whiteman, Hill, and Larson be dismissed. She further recommended that all claims against Defendants Papendick and Rais be dismissed except for Plaintiff's claim that Papendick and Rick violated his Eighth Amendment rights by failing to arrange his surgery. Excluding these claims against Papendick and Rick, she recommended that Defendants' motions for summary judgment, ECF Nos. 90 and 92, be granted.

Defendants Papendick and Rais filed objections to Magistrate Judge Morris's report. ECF No. 121. Plaintiff also filed objections to the report, contending that Magistrate Judge Morris erred in dismissing his claims that Defendants Larson, Hill, and Rais had violated his Eighth Amendment rights by reducing his pain medications. ECF No. 122. None of the parties objected to Magistrate Judge Morris's recommendation that Plaintiff's claims against Defendants Vanbergen, Zeigler, Dunning-Meyers, Bogerding, Sigler, DeLine, Trout, Klee, and Whiteman be dismissed. Accordingly, Plaintiff's claims against those defendants will be dismissed.

## I.

### A.

Neither party has objected to Magistrate Judge Morris's summary of the facts, which provides:

> Plaintiff was admitted to the Hurley Medical Center on July 19, 2014, after suffering burns on up to 49 percent of his body in a meth lab explosion. (ECF No. 90, PageID.1491; ECF No. 112, PageID.2917.) He remained at Hurley for three months, during which time he was placed in a medically induced coma for six weeks and received "extensive skin grafting." (ECF No. 98, PageID.2528.) Roughly three months later, on October 16, 2014, Plaintiff was transferred to the Otsego County Sheriff's Office. (ECF No. 92, PageID.2000.) The following day, he entered Duane Waters Hospital (DWH), run by the MDOC. (ECF No. 98, PageID.2527.)

*****

Nurse Hill was Plaintiff's "primary provider" at DHW, a role she characterized as focusing on "infection control, wound care, and pain management." (ECF No. 112, PageID.3000.) She explained that a patient's treatment plan would be revised as needed during visits with the patient, and changes to it were marked in session notes in the "assessment plan areas." (ECF No. 112, PageID.3002.) Changes could be made by "[w]however [*sic*] is seeing the patient that day . . . . So we revise the plan every time we see the patient." (ECF No. 112, PageID.3003.) There was no longer-term plan. (*Id.*) Similarly, in his deposition, Defendant Dr. Muhammad Rais testified that any physician could come to a pain management plan once they made a diagnosis and assessed the pain. (ECF No. 92, PageID.2197.) During Hill's deposition, she testified that she had treated patients with superficial burns, but never anyone with burns as extensive as Plaintiff's and that while she had no special training for burn wounds, she did use a leading reference resource as a guide. (ECF No. 112, PageID.2974, 3000.)

Hill testified at length about Plaintiff's wound-care regimen. Regarding Plaintiff's bandaging, Hill noted that he did not initially want bandages, which caused pain on the open wounds; according to Hill, he never complained to her about any lack of bandaging and she tried multiple other methods (such as meshing) to cover his wounds. (ECF No. 112, PageID.3007, 3009-3011.) She also ordered fresh linens daily. (ECF No. 112, PageID.3009.) When they discovered that his mirror for seeing where to apply ointment was missing, they got him another one. (ECF No. 112, PageID.3007-3008.) While the wounds would open in new places, overall the openings and discharges decreased over time. (ECF No. 112, PageID.3013-3014.) Also, during his time at DWH, the nurses completed a patient care flowsheet to record two check-ups each day measuring things like ambulation, pain levels, social activity, and functional level. (ECF No. 90, PageID.1569-1620.)

Regarding medications, when Plaintiff arrived from Hurley, he took, among other things, methadone (3 tablets every 8 hours), morphine (2 tablets every 3 hours), and gabapentin (Neurontin) (2 tablets every 8 hours). (ECF No. 112, PageID.2920.) DWH kept him on that regimen initially, and he was given other medications such as bacitracin. (ECF No. 112, PageID.2923.) In October, Danielle Alford, PA, switched his methadone for one 60mg tablet of MS Contin. (ECF No. 112, PageID.2925.) Hill testified that DWH does not regularly prescribe methadone and therefore she tried early on to switch to an equivalent dose of morphine. (ECF No. 112, PageID.3004-3005.) She noted that there were risks with every narcotic like methadone, but she could not think of anything specific. (*Id.*) A doctor at the facility, Defendant Dr. Terrence Whiteman, testified that methadone was "not a good drug for analgesia," so the hospital used a superior drug; specifically, methadone's residual effects outlasted its period of effectiveness, remaining in the bloodstream well after it wore off and leading to potential repercussions such as respiratory depression. (ECF No. 92, PageID.2225-2226.) He also observed that Plaintiff was a substance abuser. (ECF No. 92, PageID.2226.) Defendant Dr.

William Borgerding, who had been the chief medical officer or assistant chief medical officer during the relevant period, testified that "long-term narcotics are really not recommended for anything," they were "highly addictive," and "there's really not a lot of studies that show their benefit," so "the idea is to get them off sooner than later." (ECF No. 112, PageID.2909.)

Later in October, Nurse Jennifer Weirman added one 15mg tab of MS Contin every 8 hours so that Plaintiff would now be receiving 75mg total. (ECF No. 112, PageID.2927.) She also took his dosage of gabapentin from 100mg (which was giving him "200mg PO Q8hrs") to 400mg (which gave him "2 tabs PO Q8hrs"). (*Id.*) In November, Hill upped the gabapentin (Neurontin) to 3 tabs of 400mg every 8 hours, giving him 3600mg each day. (ECF No. 112, PageID.2929.) Later that month, Hill reordered the medications (including morphine at 30mg every 4 hours). (ECF No. 112, PageID.2931.) These dosages stayed the same the following month, and Hill added amitriptyline (25mg at bedtime) for pain. (ECF No. 112, PageID.2932; ECF No. 98, PageID.2603.)

In January 2015, Hill renewed his medications in the same dosages, including MS Contin, bacitracin, and morphine, among others. (ECF No. 98, PageID.2592.) At her deposition, Hill was asked why she discontinued applying Aquacel AG to weeping wounds on January 19, 2015, and why her notes on that day stated Plaintiff had to remove scabbing and apply bacitracin ointment to open areas. (ECF No. 112, PageID.3149-3150; ECF No. 90, PageID.1169.) Hill said the Aquacel wasn't working and that Hurley (which Plaintiff had recently seen for a follow-up, discussed below) wanted the scabs removed. (ECF No. 9 112, PageID.3049-3050.)[2] On the same day, Hill added amitriptyline for neuropathic pain. (ECF No. 90, PageID.1169; ECF No. 92, PageID.2199.)

Around the same time, she submitted a request that Defendant Dr. Keith Papendick approved for continued physical therapy. (ECF No. 98, PageID.2593-2594.) Hill had also been prescribing the maximum dosage of Neurontin (gabapentin). (ECF No. 98, PageID.2603.) The medication order for February kept his medications steady but increased the Amitriptyline to 50mg at bedtime. (ECF No. 112, PageID.2934.)

Hill ordered same roster of medications and dosages again in March. (ECF No. 112, PageID.2935.) The same month, Plaintiff was "in good spirits," with "[n]o new complaints" and normal vital signs due to the "addition of new medication." (ECF No. 98, PageID.2612.) According to the notes, Plaintiff's pain had "been stable for months." (ECF No. 98, PageID.2613.) Hill kept the medications the same in April and submitted another request for continued physical therapy, which was approved. (ECF No. 112, PageID.2936; ECF No. 98, PageID.2617-2618.)

---

[5] Although she could not recall at the deposition a specific request by Hurley to discontinue the Aquacel, her progress notes from February 23, 2015 stated that Plaintiff "[r]elates that he has been instructed to remove all scab areas and apply bacitracin until these wounds are healed per Hurley Burn Center." (ECF No. 98, PageID.2602.)

In May, Hill continued Plaintiff's current medications and dosages. (ECF No. 112, PageID.2937) He was doing well that month, according to Hill's report, and the pain control was "[a]dequate." (ECF No. 98, PageID.2623-2624.) The following month she took Plaintiff off of MS Contin and reduced his morphine from a 30 mg tablet every four hours to one every six hours. (ECF No. 98, PageID.2630.) In June, too, she submitted requests (that were ultimately approved by Dr. Papendick) for refitting of his Jobskin burn stockings and for continued physical therapy. (ECF No. 98, PageID.2635-2638.)

More generally, at her deposition Hill could not recall that Plaintiff frequently requested additional pain medication, and she explained that she added several on her own, including Neurontin and morphine. (ECF No. 112, PageID.3062.) The hospital's goal was to get patients functioning again, so she measured Plaintiff's pain in part based on whether he could independently complete daily activities. (ECF No. 112, PageID.3063.) This, along with vital signs and other indications, provided objective signs by which to judge subjective complaints of pain. (ECF No. 112, PageID.3063-3064.) Dr. Whiteman similarly testified that the effectiveness of pain medications was gauged by objective observations, such as the appearance of discomfort and the patients' functional capacities. (ECF No. 92, PageID.2227-2228.)

In addition to these treatments, additional procedures on Plaintiff's burns were being considered. Plaintiff had a checkup at Hurley in December 2014. (ECF No. 98, PageID.2586-2587.) Hill testified that she sent the request to have him examined at Hurley. (ECF No. 112, PageID.3016.) At the time, he had been improving and she likely called Hurley to see if they wanted him back for a follow up. (ECF No. 112, PageID.3019-3020.) At Hurley, Dr. Stephen Morris noted that Plaintiff had "some scattered residual unhealed areas," no signs of infection, left-elbow and anterior neck contractures, some difficulty extending his neck, and webbing between two fingers on his right hand, and that the grafting in his neck had healed well. (ECF No. 98, PageID.2586.) Plaintiff testified that Dr. Morris reacted to seeing him by "throwing his hands in the air and said I don't know what we did anything for because my condition was so poor that he was disgusted that he put all his effort into fixing me . . . ." (ECF No. 112, PageID.3213)

After examining Plaintiff, Dr. Morris wrote out his recommendations to DWH medical officials:

> [R]ecommending redo skin grafts on the left side of the neck, the left shoulder, the scattered areas in the right shoulder, and the anterior chest. It is also recommended that he undergo daily hand therapy and physical therapy. At some point in the future months, he will benefit from a contracture release and regrafting. Quite likely it would be useful to use Integra on these. However, this should wait until all of the small residual open areas are healed.

(ECF No. 98, PageID.2586; *see also* ECF No. 113, PageID.3571 (handwritten note from Dr. Morris containing these recommendations).) A skin graft "adds an element to grant the skin together," whereas the contracture "cuts the bonds of the skin." (ECF No. 112, PageID.3132.) Dr. Morris also noted that the message to prison officials informed them that it was

> up to the prison system to determine where he gets care and we would not undertake this at Hurley unless we had written authorization for surgery and approval for however, long a stay was necessary which in his situation could be as long as 30 days. Particularly in contracture releases, if Integra is used it would be pointless for him to go back to the prison system or it would simply fail. However systemically he is not particularly ill.

(ECF No. 98, PageID.2586.) At Plaintiff's deposition, he said that Dr. Morris's recommendation was for immediate surgery. (ECF No. 112, PageID.3213.) Hill said she didn't see the documentation from his visit until sometime in January 2015. (ECF No. 112, PageID.3028, 3033-3034.) Her notes from that month stated that she finally received the paperwork and that it said Hurley would do the skin grafts if he could stay there until he healed. (ECF No. 90, PageID.1170.) Hill interpreted the notes from Hurley as indicating that all procedures—regrafting and contracture release—should wait until his open areas healed. (ECF No. 112, PageID.3037-3038.)

On June 5, 2015, Hill placed a "407"—DWH's term for many types of medical requests, (ECF No. 112, PageID.2990)—for the contracture release and regrafting mentioned in the Hurley notes. (ECF No. 90, PageID.815; ECF No. 98, PageID.2631; ECF No. 112, PageID.3043-3044.) On the same record reporting the 407 request, Hill wrote that "[p]ain medications will begin to be weaned now as [Plaintiff] is functioning well at this time. He regularly goes out for out time and ambulates," was able independently to do all activities of daily living, and participated in physical therapy. (ECF No. 90, PageID.815.)

A few days later, on June 9, 2015, Dr. Papendick responded to Hill's request. (ECF No. 98, PageID.2633.) During the relevant period, Dr. Papendick served as the utilization medical director, which meant he reviewed the 407 requests submitted by medical providers and formulated alternative treatment plans if necessary; he did not see patients and never saw Plaintiff, nor did he have responsibility for pain management. (ECF No. 92, PageID.2149-2152, 2159, 2980.) In determining whether to approve a 407 request, cost was never a factor, Dr. Papendick testified. (ECF No. 92, PageID.2152, 2157-2159.)

Regarding Hill's request for the procedures, Dr. Papendick stated that "[m]edical necessity not determined." (ECF No. 98, PageID.2634.) Instead, he proposed an alternative plan "to find a surgeon locally who could manage his case." (ECF No. 92, PageID.2152.) Therefore, he rejected the request and instead directed that

another surgeon be found. (ECF No. 98, PageID.2634.) The problem with sending him to Hurley, Dr. Papendick testified, was the 30 days he might need to remain there, raising concerns about public security. (ECF No. 92, PageID.2152, 2156.) Ultimately, Dr. Papendick testified, security concerns did not dictate the plan if the patient needed care, but the preference was for treatment at one of the two secure units in Michigan, Allegiance and McLaren, or at a local option where Plaintiff could be returned to DWH for recovery post-surgery. (ECF No. 92, PageID.2152-2153.)[6] However, if Plaintiff could not get medically necessary treatment at these alternative locations, Dr. Papendick would have approved a request to send him to Hurley—but no such request was ever made, he testified. (ECF No. 92, PageID.2157-2158.)

While the alternative plan was being formed, Plaintiff was transferred from DWH to the "C-Unit" on July 7, 2015, which was a "step down" facility, meaning "they were stable for [DWH] . . . . [and] they have a [medication] taper and then we continue that taper." (ECF No. 98, PageID.2645; ECF No. 92, PageID.2199-2200; see also ECF No. 92, PageID.2233 (Dr. Whiteman's testimony that the C-Unit "[p]rovides care for low security risk patients that [sic] can't be cared for in the general population and don't require infirmary level care").) Defendant Dr. Lynn Larson signed off on the move. (ECF No. 98, PageID.2649.) She testified that she saw Plaintiff twice, once on June 25, 2015 and once on July 7, 2015. (ECF No. 112, PageID.3091.)[7] On the first occasion, she noted webbing, restricted motion, a clawed right hand, and that his urine stream was weakened and "hesitancy—on Flomax." (ECF No. 90, PageID.757.) Dr. Larson believed that despite the restricted movements and clawed hand, his function was not limited because he could still complete daily activities such as dressing himself, bathing himself, and moving independently. (ECF No. 112, PageID.3162-3163.)

According to Dr. Larson, Plaintiff's urinary problems might have been due to his amitriptyline medication (an antidepressant sometimes used for pain relief), which she reduced and later stopped upon his transfer, explaining that this medication can affect the urinary system. (ECF No. 90, PageID.758; ECF No. 112, PageID.3074, 3153-3154.) Benadryl was another possible cause of the urinary issues, so she stopped that medication as well, explaining that even though Plaintiff was taking medication specifically for the urinary problems (Flomax) he was still struggling with this issue and "the best thing to do in this situation is to remove the offending components to it, and then solve the problem." (ECF No. 112, PageID.3158.) Asked if she was concerned that discontinuing these medications might increase his pain, she responded that "when I stop medications, I review it with the patient as well" and monitor the pain level; here, for example, she decreased the amitriptyline but

---

[6] He testified that he had experience with burn victims, but not extensively and he had not officially treated anyone with severe burns. (ECF No. 92, PageID.2147.)

[7] Dr. Larson testified that she was "not a burn expert" and had not "read the recent literature on burns." (ECF No. 112, PageID.3137.)

"the pain didn't dramatically increase . . . . So it was a trial. I didn't just stop it cold turkey." (ECF No. 112, PageID.3158-3159.)[8]

At the June visit, she continued the MS Contin prescription writing "taper as able," and morphine for breakthrough pain, and increased Neurontin due to nerve pain. (ECF No. 90, PageID.758; ECF No. 112, PageID.3074, 3143, 3145-3146.)[9] She made more changes at the July appointment. (ECF No. 112, PageID.3076.) Gabapentin (Neurontin) was reduced from three 400mg tablets every 8 hours to two tablets; MS Contin was reduced from one 60mg tablet every 8 hours to one 60mg tablet every 12 hours; morphine went from one 30mg tab every 6 hours to one 15mg tab every 8 hours; and lidocaine and amitriptyline were discontinued. (ECF No. 112, PageID.3076.)

Tapering off narcotics was "optimal," Dr. Larson testified, and the hospital would "give enough narcotics so that the patient can care for themselves and be functional." (ECF No. 112, PageID.3143-3145.) To taper, they would reduce the narcotic "and see how he does functionally." (ECF No. 112, PageID.3145.) Plaintiff's "pain was managed quite well" both times Dr. Larson examined him. (ECF No. 112, PageID.3144.) Dr. Larson also recalled at her deposition that when she saw him, Plaintiff could care for himself and just needed help applying the bacitracin to his back. (ECF No. 112, PageID.3136.)

In the C-Unit transfer paperwork, Dr. Larson indicated that Plaintiff's elbows were "flexing," but that physical therapy was helping; his neck was webbed and had restricted range of motion; and his right hand was clawed, such that he could not fully open it. (ECF No. 98, PageID.2649.) The record also reports that DWH had provided Plaintiff, per Hurley's recommendations, with burn gloves and a second skin vest, and that Plaintiff's pain was stable with his current medications and he was "independent in self-care," so was "ready to go to C Unit." (ECF No. 98, PageID.2655.) Additionally, his open wounds had closed. (ECF No. 98, PageID.2656.) Regarding the surgery, Dr. Larson wrote that "the cost of staying inpatient [at Hurley after the possible surgery] would be a large amount," and so they considered other options, including a Dr. Lanigan. (ECF No. 98, PageID.2655; ECF No. 112, PageID.3113.) The surgery "was still in question as of discharge." (*Id.*) At her deposition, when asked if the 30 days was "a problem for some reason that you're aware of," she responded that she "wasn't the primary provider, and I didn't get those specific answers from utilization." (ECF No. 112, PageID.3118-3119.) She followed up, however, by stating that DWH tried to employ secure units,

---

[8] Dr. Larson also testified that she stopped magnesium, which another provider had ordered for Plaintiff's constipation, because she did not use that substance to treat constipation and because he was already taking Lactulose for constipation. (ECF No. 112, PageID.3160-3161.) The records show that Hill prescribed the magnesium and Lactulose for constipation. (ECF No. 90, PageID.1169.)

[9] She testified that she reduced the morphine prescription from every 8 hours, which was "a lot," to every 12 hours. (ECF No. 112, PageID.3143, 3145-3146.) However, the order form from June 25, 2015, shows that she ordered a 30mg tab every 6 hours. (ECF No. 112, PageID.3074.) In addition, the same form orders only 60mg of MS Contin, an apparent reduction from the 75mg he'd been taking before, although no such changes were expressly mentioned on the order form (even though adjustments were usually noted). (*Id.*)

and his physical examination showed no infection and healing wounds. (ECF No. 112, PageID.3119-3120.) Dr. Whiteman testified that the 30 days was a problem because it was "not best practices," in that he could get adequate recovery care at DWH and Hurley had no reason to believe otherwise. (ECF No. 92, PageID.2230.) Cost, according to Dr. Whiteman, wasn't a factor. (*Id.*) Hill testified that "any inmate who is off-site has to have two officers with them at all times." (ECF No. 112, PageID.3041.)

In the C Unit, Defendant Dr. Muhammad Rais took charge of Plaintiff's care. (ECF No. 98, PageID.2660.) When Plaintiff arrived in the C Unit, Dr. Rais also ordered lidocaine gel for pain relief, which Dr. Larson had discontinued upon transfer, likely because she believed Plaintiff was no longer using it and because she "knew if he needed it, it could be reordered once he got to C Unit. So it's not like things were just going to stop."[10] (ECF No. 92, PageID.2206; ECF No. 98, PageID.2666; ECF No. 112, PageID.3156-3157, 3159-3160.) The lidocaine request was not approved, however. (ECF No. 92, PageID.2206.) Dr. Rais testified that physical therapy was one component of the pain management plan, as were non-opioid medications such as Motrin, Tylenol, and Neurontin. (ECF No. 92, PageID.2198, 2206.)

Dr. Rais noted that Plaintiff's Neurontin had been tapered, and he wrote that Plaintiff "will need Neurontin 300 mg PO Four times a day for one year." (*Id.*) He explained that tapering was measured by toleration of pain, not by its total elimination; a tapering plan "means keeping them comfortable, discontinuing it [*i.e.*, a medication] to the level where they can function." (ECF No. 92, PageID.2198.) The reason for the Neurontin taper was that "there has to be a blending Neurontin level which we check for patients inside . . . and then if the level [from lab results] is therapeutic [*sic*] range, there's no benefit for giving hydros." (ECF No. 92, PageID.2200-2201.) Dr. Borgerding testified that the need taper Neurontin depended on the type of pain a patient had, and that the drug "is not clinically indicated for pain, but it's used quite a bit." (ECF No. 112, PageID.2911.)

Tapering was "standard procedure," according to Dr. Rais, so that patients would not become dependent on an opioid, "but their pain is controlled in a compassionate way" and assessed with "constant evaluation." (ECF No. 92, PageID.2198-2199.) There was nothing written out that labelled the progressive steps in a tapering plan. (ECF No. 92, PageID.2199.) In the C Unit, approval from the pain management committee was required to initiate opioid medications (due to their potential side effects and risk of creating dependency) or initiate a tapering plan. (ECF No. 92, PageID.2199-2200.)

---

[10] Dr. Larson acknowledged that she had not worked in C Unit, but she knew that "[a]ny facility that I transfer a patient to, everything gets re-evaluated." (ECF No. 112, PageID.3160.) Hill had prescribed the lidocaine before the transfer. (ECF No. 112, PageID.2943.)

When Plaintiff completed his initial taper, around August 11, 2015, he continued to request pain medications and Dr. Rais testified that he "tried to help him and give him another option to complete another taper if he want[ed] to," even though Plaintiff was not showing signs of withdrawal. (ECF No. 92, PageID.2201-2202.) Hospital records from around that time show that Plaintiff was on a Neurontin taper and that Dr. Rais concluded he "will need to continue Neurontin." (ECF No. 98, PageID.2692.) As Dr. Rais observed at the deposition, Plaintiff during this period was filing requests (called "kites") for pain medications due to ongoing pain, as well as grievances. (ECF No. 92, PageID.2202; *see, e.g.*, ECF No. 98, PageID.2693.) In a 407 request to the pain committee dated August 27, 2015, Dr. Rais observed that the Neurontin was not helping with the pain and that Plaintiff would benefit from Norco (he testified that it might have helped "just to some extent"); the request was denied a few days later by Dr. Gary Kerstein. (ECF No. 98, PageID.2709, 2711; ECF No. 98, PageID.2205.) Afterwards, Plaintiff continued to request increased pain medications and surgery. (ECF No. 98, PageID.2712-2714.) Overall, Dr. Rais testified, he requested a few tapers. (ECF No. 92, PageID.2204.)

Regarding other medications, in July 2015, Dr. Rais ordered 300mg of gabapentin (Neurontin) four times a day. (ECF No. 112, PageID.3258.) At the start of August Dr. Rais wrote, "Monitoring for pain. No change in medicine." (ECF No. 112, PageID.3307.) Later that month, he continued the gabapentin (Neurontin), stopped MS Contin and morphine, and started acetaminophen (two 325mg tabs three times a day) and Mobic (one 15mg tab a day). (ECF No. 112, PageID.3260, 3262.)

When Dr. Rais visited Plaintiff on September 17, 2015, he explained the recent the [*sic*] pain committee's deferral of another round of tapering; he also wrote that "[i]t has been two weeks so restarting morphine and taper again will not help." (ECF No. 98, PageID.2720.) Plaintiff's kites were also addressed, (*id.*), although he continued to submit new ones complaining of pain. (ECF No. 98, PageID.2730, 2733-2734.)

Dr. Rais also followed up on the possible surgery. He understood that there was a "safety security issue" at one facility, so he sought places in Lansing and with the secured units. (ECF No. 92, PageID.2207.) On July 9, 2015, Dr. Rais requested that Plaintiff have the contracture release and regrafting procedures with Dr. Pfeiffer at Allegiance. (ECF No. 98, PageID.2663; ECF No. 92, PageID.2207-2208.) But Dr. Pfieffer wanted to see Plaintiff first—although Dr. Rais acknowledged uncertainty about whether Dr. Pfieffer made this request—so later in July Dr. Rais submitted a request for a consultation regarding the surgery. (ECF No. 98, PageID.2673; ECF No. 92, PageID.2207-2208.) The request was approved. (ECF No. 92, PageID.2207.) After reviewing Plaintiff's charts, Dr. Pfeiffer refused to see him. (ECF No. 92, PageID.2208-2209.) Following this, Dr. Rais testified that he contacted two other surgeons, Dr. Jones and Dr. Smith. (ECF No. 92, PageID.2209.) On the August 27, 2015 notes, Dr. Rais wrote that he "[t]ried to contact surgery at Allegiance and Mclaren and plastic surgery and no one is willing

to accept patient for contracture release." (ECF No. 98, PageID.2708.) At his deposition, Dr. Rais explained that "this was a complicated procedure, and there are not many plastic . . . surgeons who do this and choice is limited." (ECF No. 92, PageID.2210.)

By November 12, 2015, Dr. Rais had concluded that "[n]o Surgery or plactic [*sic*] surgery center is willing to address this and perform a surgery. Continue to montor [*sic*]." (ECF No. 98, PageID.2732; ECF No. 92, PageID.2210-2211.) Dr. Whiteman testified that many plastic surgeons might be reluctant to get involved in situations like this, where the burns resulted from a meth lab explosion. (ECF No. 92, PageID.2228.) Dr. Rais did not recontact Hurly [*sic*] regarding their ability to do the surgery because it was clear he could not be returned to DWH after surgery at Hurley. (ECF No. 92, PageID.2212.) He thought the conclusion had been reached that returning to Hurley for surgery was "out of the question," although he could not recall any specific discussion on the matter. (ECF No. 92, PageID.2212-2213.) It was something that others had discussed before Plaintiff came to him. (ECF No. 92, PageID.2213.)

In February 2016, Plaintiff was discharged from the C-Unit. (ECF No. 98, PageID.2749.) He was released from prison on September 1, 2016, and the same day he returned to Dr. Morris at Hurley. (ECF No. 113, PageID.3660.) He had not been back since December 2014. (*Id.*) Dr. Morris wrote:

> At this time, his burns wounds have healed. He has actually done very well. The current issues that he has involved contractures of the hands, the anterior neck and the axilla. On the right hand, there are contractures of the first webspace as well as webbing of the 2nd and 3rd web spaces. The 4th is actually quite good. On the left hand, his primary issue is a band on the radial side of the thumb. The rest of the hand does not bother him. There are some limiting contractures of the anterior neck and bilateral axilla. . . . Mr. Lashuay's advised this would require surgical release. Since the right hand bothers him the most, it will be reasonable to start with the right hand, we could not do all of the areas at once. Quite likely, we would use an Integra regimen on the neck and axilla.

(ECF No. 113, PageID.3660.) Later that month he underwent contracture release and skin grafting on his right hand. (ECF No. 113, PageID.3661; ECF No. 114, PageID.2491-2492.) A few days after that, Plaintiff informed Hurley that he would not be following up with them because of the "excessive driving distance," and he would instead rely on his primary care physician. (ECF No. 113, PageID.3662.)

In 2018, Dr. Morris completed an affidavit. (ECF No. 90, PageID.1941-1943.) At the December 2014 appointment, Dr. Morris "recommended that [Plaintiff's] future treatment should include, at some point, a contracture release and re-grafting." (ECF No. 90, PageID.1942.) When Plaintiff returned to him in 2016, "[i]t was not

too late for [Plaintiff] to have the contracture release and re-grafting procedures." (*Id.*) Plaintiff's progress at the time of the 2016 surgery "was consistent with my expectations for him." (*Id.*) Afterwards, when Plaintiff ceased following up at Hurley, Dr. Morris believed that "[h]e had the potential at that time for additional progress and improvements," possibly with additional surgeries. (*Id.*) Dr. Morris concluded that "[a]t the time of my involvement in [Plaintiff's] care from 2014-2016, I did not identify any harm that [Plaintiff] suffered as a result of inadequate or delayed medical care while incarcerated." (ECF No. 90, PageID.1943.)

The record also contains a report and affidavit from Plaintiff's physician from early 2017. (ECF No. 113, PageID.3667-3687.) To his doctor, Dr. David Yonick, Plaintiff denied tingling, numbness, or weakness, but did report stiffness and contractures in his hands and neck. (ECF No. 113, PageID.3670.) Dr. Yonick recommended "aggressive OT and physical therapy" and "bilateral axillary Z-plasty releases." (ECF No. 113, PageID.3671.) Plaintiff reported to the physical therapist that his exercises were markedly reducing the pain. (ECF No. 113, PageID.3680.) Dr. Yonick later completed an affidavit, averring that when he evaluated Plaintiff "there was still an opportunity for a major contracture release undertaking, but only if [Plaintiff] was compliant with my recommended orders of physical and occupational therapy." (ECF No. 92, PageID.2017.) Plaintiff was not compliant and failed to schedule any follow up visits with Dr. Yonick, the affidavit concluded. (*Id.*)

\*\*\*\*\*

Other affidavits and reports from medical professionals also appear in the record. Dr. Matthew Hettle completed an affidavit, explaining that he treated Plaintiff at the rehabilitation unit in Hurley before the transfer to DWH. (ECF No. 92, PageID.2009.) Upon discharge from Dr. Hettle's care, Plaintiff "presented to be independent with mobility using adaptive techniques, and he could complete all activities of daily living." (ECF No. 92, PageID.2010.) Dr. Hettle had expected that Plaintiff "would need contracture release surgery at some point in the future" and that his hands were unlikely to regain their former functionality. (*Id.*)

Dr. Randall Stolz also provided an expert report dated March 12, 2019. (ECF No. 92, PageID.2020-2030.) He explained that Plaintiff's initial roster of pain medications was "highly potent" and "were adjusted over time as seemed warranted. . . . It is standard of care to try and wean patients off of narcotics due to tolerance and to avoid addiction if possible and substitute less potent pain control medications. This was done during [Plaintiff's] care." (ECF No. 92, PageID.2029.) Ultimately, Dr. Stolz concluded that "[t]here was no delay in the wound care or pain management" and that "[t]here was no harm in waiting for further surgery until September 2016." (ECF No. 92, PageID.2030.)

Dr. Gary Vercruysse completed an expert report in March 2019. (ECF No. 92, PageID.2040-2043.) He stated that it was common for major burn victims to need

"reconstructive surgery for contractures several months after they are initially grafted." (ECF No. 92, PageID.2042-2043.) Burns and sores could persist for months…because the initial surgery is meant to save the patient's life, so the skin used for grafting often is "relatively poor quality" and the doctors might anticipate future regrafting with better skin when the emergency passes. (ECF No. 92, PageID.2043.) In conclusion, Dr. Vercruysse wrote that although incarceration delayed the second surgery, and the "standard" of care at the DWH might not have been equivalent to that "of a burn center," Plaintiff was not denied care "and it would likely still have taken many months/ more than a year for him to undergo revisionary burn surgery" had he not been imprisoned. (*Id.*)

Plaintiff sued various medical staff in November 2017, after his release from prison. (ECF No. 1.) In his second amended complaint, he alleges that defendants violated his rights under the Eighth and Fourteenth Amendments by being deliberately indifferent to his serious medical needs. (ECF No. 65, PageID.539-540.) His complaint listed, among other things, defendants' failure to provide the regrafting and contracture release procedures, failure to provide wound care, and "[d]enial of medically necessary pain management." (ECF No. 65, PageID.540.)

ECF No. 120 at PageID.3771-3793.

### B.

Magistrate Judge Morris found that "Plaintiff's allegations of inadequate treatment fall under three broad categories–wound care, pain medications, and surgery." ECF No. 120 at PageID.3814. She addressed each of these three categories in turn.

Of the Defendants, Plaintiff only alleged that Defendant Hill provided inadequate wound care. Magistrate Judge Morris determined that Plaintiff had furnished insufficient evidence to sustain a claim of inadequate wound care against Defendant Hill and recommended that the claim be dismissed. Plaintiff has not objected to the dismissal of this claim. Accordingly, the claim of inadequate wound care against Defendant Hill will be dismissed.

Magistrate Judge Morris then addressed Plaintiff's arguments that Defendants Larson, Hill, and Rais provided inadequate pain medication. Magistrate Judge Morris recommended dismissing the claim because Plaintiff did not furnish "proof of his need for certain medications or dosages and the effects of not getting them." ECF No. 120 at PageID.3817.

Magistrate Judge Morris then addressed Plaintiff's final claims, that Defendants violated Plaintiff's Eighth Amendment rights by failing to arrange contracture and regrafting surgeries for Plaintiff. ECF No. 120 at PageID.3823. She recommended that a question of fact remained as to whether Papendick and Rais were deliberately indifferent to Plaintiff's medical needs. ECF No. 120 at PageID.3824-3830.

## II.

Pursuant to Federal Rule of Civil Procedure 72, a party may object to and seek review of a Magistrate Judge's report and recommendation. See Fed. R. Civ. P. 72(b)(2). Objections must be stated with specificity. *Thomas v. Arn*, 474 U.S. 140, 151 (1985) (citation omitted). If objections are made, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). De novo review requires at least a review of the evidence before the Magistrate Judge; the Court may not act solely on the basis of a Magistrate Judge's report and recommendation. *See Hill v. Duriron Co.*, 656 F.2d 1208, 1215 (6th Cir. 1981). After reviewing the evidence, the Court is free to accept, reject, or modify the findings or recommendations of the Magistrate Judge. *See Lardie v. Birkett*, 221 F. Supp. 2d 806, 807 (E.D. Mich. 2002).

Only those objections that are specific are entitled to a de novo review under the statute. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). "The parties have the duty to pinpoint those portions of the magistrate's report that the district court must specially consider." *Id.* (internal quotation marks and citation omitted). A general objection, or one that merely restates the arguments previously presented, does not sufficiently identify alleged errors on the part of the magistrate judge. *See VanDiver v. Martin*, 304 F.Supp.2d 934, 937 (E.D.Mich.2004). An "objection" that does nothing more than disagree with a magistrate judge's determination, "without

explaining the source of the error," is not considered a valid objection. *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Without specific objections, "[t]he functions of the district court are effectively duplicated as both the magistrate and the district court perform identical tasks. This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrate's Act." *Id.*

## III.

By its terms, the Eighth Amendment prohibits the imposition of any cruel and unusual punishment. At the time of its adoption, "cruel and unusual punishment" included draconian punishments such as the rack, thumbscrews, "tortures[,] and other barbarous methods of punishment." *Gregg v. Georgia*, 428 U.S. 153, 170 (1976) (internal quotation marks and citation omitted). Since then, Eighth Amendment jurisprudence has not remained static, but has developed with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100 (1958). Under this evolving standard, the Supreme Court requires prison officials to "provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Prison officials are prohibited from being deliberately indifferent to a prisoner's serious medical needs, meaning the "unnecessary and wanton infliction of pain." *Id.* at 104.

A constitutional claim for the deprivation of adequate medical care "has two components, one objective and one subjective." *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001), *cert. denied*, 537 U.S. 817 (2002)).

The objective component requires a plaintiff to show the existence of a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish a serious need for medical care, "*Farmer* requires only that 'the inmate show that he is incarcerated under

conditions posing a substantial risk of serious harm[,]' so as to avoid 'the unnecessary and wanton infliction of pain.'" *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 896 (6th Cir. 2004) (quoting *Farmer*, 511 U.S. at 834). A serious medical need may be demonstrated by a physician's diagnosis mandating treatment or a condition that "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 897 (citations omitted).

Establishing the second, subjective, component "requires a plaintiff to 'allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'" *Dominguez v. Corr. Med. Serv.*, 555 F.3d at 550 (quoting *Comstock*, 273 F.3d at 703). Deliberate indifference requires "more than negligence or the misdiagnosis of an ailment." *Comstock*, 273 F.3d at 703 (citations omitted). Courts evaluating such a claim "distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir.1976)).

Allegations of negligence, poor medical judgment, or unsuccessful treatment do not provide a basis to find an Eighth Amendment violation. *Smith v. Green*, 959 F.2d 236 (6th Cir. 1992) (citing *Estelle, v. Gamble*, 429 U.S. 97, 106 (1976)). "Where a prisoner alleges only that the medical care he received was inadequate, 'federal courts are generally reluctant to second guess medical judgments,' although 'it is possible for medical treatment to be 'so woefully inadequate as to amount to no treatment at all.'" *Id.* (citing *Westlake*, 537 F.2d at 860 n. 5). But "a desire for additional or different treatment does not suffice by itself to support an Eighth Amendment claim." *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014) (citing *Estelle*, 429 U.S. at 107;

*Rhinehart v. Scutt*, 509 F. App'x 510, 513–14 (6th Cir. 2013)) (other citation omitted). *See also Alspaugh*, 643 F.3d at 169 (while "Alspaugh certainly would have desired more aggressive treatment, he was at no point denied treatment.").

## IV.

Plaintiff and Defendants Papendick and Rais have filed objections to Magistrate Judge Morris's report and recommendation. Both sets of objections will be addressed in turn and for the following reasons, Plaintiff's objections will be overruled and Defendant Papendick and Rais's objections will be sustained.

## A.

Magistrate Judge Morris recommended dismissing Plaintiff's claim of inadequate pain management treatment by Defendants Larson, Hill, and Rais because Plaintiff did not furnish "proof of his need for certain medications or dosages and the effects of not getting them." ECF No. 120 at PageID.3817. Plaintiff filed an objection to Magistrate Judge Morris's report, but did not identify any medical evidence to support his assertion. Without this showing, he has not demonstrated that he experienced a serious medical need.

Plaintiff does not claim in his complaint that Defendants failed to provide him with pain medications. Instead, he claims that Defendants reduced or ceased certain medications that he allegedly needed. ECF No. 112 at PageID.2861-2862. As noted above, Defendants reduced Plaintiff's pain medications for various medical reasons, including concerns about the addictive nature of some of the drugs. Plaintiff has not provided any medical evidence to support the proposition that this decrease in medication caused a serious medical need. "To the contrary, the evidence all suggests that the tapering which occurred was standard practice or at least had some medical rationale." ECF No. 120 at PageID.3817. Though he may disagree with Defendants

decision to reduce his pain medications, this does not rise to the level of an Eighth Amendment violation. *See Owens v. Hutchinson*, 2003 WL 22434571, at *2 (6th Cir. Oct. 24, 2003) ("A patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim.").

Accordingly, Plaintiff's objections will be overruled.

## B.

Defendants Papendick and Rais object to Magistrate Judge Morris's recommendation that questions of fact remain regarding their actions related to Plaintiff's recommended surgery. As explained above, under the objective component, a plaintiff must show the existence of a "sufficiently serious" medical need. *Dominguez*, 555 F.3d at 550 (6th Cir. 2009) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A serious medical need may be demonstrated by a physician's diagnosis mandating treatment or a condition that "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004). "[F]ailure to provide the prescribed plan of treatment may form the basis of a claim for deliberate indifference to an inmate's serious medical needs." *Richmond v. Huq*, 885 F.3d 928, 941 (6th Cir. 2018); *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991).

Rais and Papendick claim that "Plaintiff has not established a serious medical need, because there was no timeline associated with the recommended surgery and no harm would have resulted from delaying the procedure." ECF No. 121 at PageID.3836. Dr. Morris, the doctor who treated Plaintiff at Hurley prior to Plaintiff's transfer to DWH, testified in an affidavit that:

> Based on Mr. Lashuay's medical chart, between July 24, 2014 and September 30, 2014, a series of skin graft surgeries were performed on Mr. Lashuay's burns.

On October 15, 2014 I noted that Mr. Lashuay was likely to require contracture releases in the future; however, prior to any further surgery he would have to maximize his available functioning and allow the grafted wounds to mature.

On December 19, 2014, I had my first follow up with Mr. Lashuay following his discharge from Hurley Rehab in October. Mr. Lashuay presented with a healed face, scattered residual unhealed areas on the left side of his neck, left shoulder, and right shoulder. I also noted poor hand movement, left elbow contracture, and no signs of infection.

I recommended that Mr. Lashuay's future treatment should include, at some point, a contracture release and re-grafting…

When Mr. Lashuay was released from prison in September 2016, he had another follow-up visit with me. It was not too late for Mr. Lashuay to have the contracture release and re-grafting procedures at that time.

On September 26, 2016, I performed another skin graft on Mr. Lashuay's right hand. At that time, I recommended a post-surgical follow-up visit and additional surgery to be completed at a later time.

Mr. Lashuay did not schedule any further follow up with me…

At the time of my involvement in Mr. Lashuay's care from 2014-2016, I did not identify any harm that Mr. Lashuay suffered as a result of inadequate or delayed medical care while incarcerated.

ECF No. 90-13. Another doctor who treated Plaintiff at Hurley, Dr. Hettle, testified that "it was expected that Mr. Lashuay would have scarring and that he would need contracture release surgery at some point in the future." ECF No. 92-6 at PageID.2010.

Neither Dr. Morris nor Dr. Hettle provided a specific timeframe in which Plaintiff should receive his surgery. Eight months after Plaintiff was admitted to DWH, Dr. Hill requested that Plaintiff receive the surgeries. Her report provided:

407 placed for Contracture Release surgery at Hurley Burn Clinic. This surgery request has been held per instruction from the Burn Clinic whose progress note indicated:

"At some point in the future months, he will benefit from a contracture release and regrafting. However, this should wait until [*sic*] all of the small residual open areas are healed."

ECF No. 90-3. The next month, Dr. Rais also requested that Plaintiff receive the surgery. His report provided, "It has been recommended by Hurley Burn Center that once all open wounds are healed he could/should have contracture release." ECF No. 98 at PageID.2663. He contacted three different surgeons, but concluded by November 2015 that none of them were willing to perform Plaintiff's surgery.

Magistrate Judge Morris determined that Defendant Hill's and Defendant Rais's recommendations for the surgery demonstrate that the Defendants acknowledged that the surgery was necessary. However, neither their requests nor the original recommendations by Dr. Morris or Dr. Hettle provide any indication that the surgery had to be performed immediately. Plaintiff cannot sustain his argument that he suffered a serious medical need when Defendants allegedly failed to "provide the prescribed plan of treatment." *Richmond v. Huq*, 885 F.3d 928, 941 (6th Cir. 2018). None of his healthcare providers concluded that the surgery was urgent or required immediate attention. This is further supported by Dr. Morris's assertion that following Plaintiff's discharge from DWH, Dr Morris concluded that "[i]t was not too late for Mr. Lashuay to have the contracture release and re-grafting procedures at that time."

Magistrate Judge Morris notes that Dr. Morris's statement "cuts both ways" and reasons that:

> [P]erhaps the lack of an earlier surgery in prison did not harm Plaintiff over the long run, the fact that the procedures could be effective suggests that an earlier surgery would have provided him increased functionality or relief (or whatever Dr. Morris meant by effectiveness) while still in jail. At the very least, then, Dr. Morris's statement does not weigh against the possibility that more timely procedures would have provided benefits to treat this serious medical need.

ECF No. 120 at PageID.3825. Her recommendation further provides:

> Regardless, the fact that Plaintiff might have eventually received treatment in time to benefit from it does not negate the pain or loss of function he might have

experienced prior to the treatment—and given the evidence that he needed the procedures, it is reasonable to conclude that at least some of his suffering and physical difficulties in prison flowed from the lack of surgery…Indeed, while in prison, his right hand was clawed, and his motions were restricted. *See, e.g.*, (ECF No. 90, PageID.757.)

*Id.* at PageID.3826.

However, during Plaintiff's incarceration, he was receiving continuous treatment for his burns. The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). "Allegations 'that more should have been done by way of diagnosis and treatment' and 'suggest[ions]' of other 'options that were not pursued' raise at most a claim of medical malpractice, not a cognizable Eighth Amendment claim." *Rhinehart v. Scutt*, 894 F.3d 721, 741 (6th Cir. 2018) (quoting *Estelle*, 429 U.S. at 107).

Plaintiff does not dispute that he was receiving treatment for his burns while incarcerated. Though Dr. Morris, Dr. Hill, and Dr. recommended that Plaintiff receive surgery at some undetermined point in the future, this alone does not rise to the level of an Eighth Amendment violation. Plaintiff received treatment for his burns the entire time he was incarcerated. This is supported by Dr. Morris's assertion that he "did not identify any harm that Mr. Lashuay suffered as a result of inadequate or delayed medical care while incarcerated." ECF No. 90-13. Though Plaintiff may have desired that the surgery occur sooner, this does not negate the fact that Plaintiff was still receiving adequate medical care while incarcerated. Accordingly, his complaint does not qualify as an Eighth Amendment claim.

**V.**

Accordingly, it is **ORDERED** that the Report and Recommendation, ECF No. 120, is **ADOPTED IN PART**.

It is further **ORDERED** that Plaintiff's objections, ECF No. 122, are **OVERRULED**.

It is further **ORDERED** that Defendants' objections, ECF No. 121, are **SUSTAINED**.

It is further **ORDERED** that Defendants' motions for summary judgment, ECF Nos. 90 and 92, are **GRANTED**.

It is further **ORDERED** that Plaintiff's Second Amended complaint, ECF No. 65, is **DISMISSED**.

Dated: March 16, 2020                                    s/Thomas L. Ludington
                                                        THOMAS L. LUDINGTON
                                                        United States District Judge